1  **JASON I. SER**
California State Bar No. 201816
2  FEDERAL DEFENDERS OF SAN DIEGO, INC.
225 Broadway, Suite 900
3  San Diego, California  92101-5008
Telephone:  (619) 234-8467
4  jason_ser@fd.org

5  Attorneys for Mr. Smith

6

7

8                    UNITED STATES DISTRICT COURT

9                    SOUTHERN DISTRICT OF CALIFORNIA

10                    **(HONORABLE JEFFREY T. MILLER)**

11  UNITED STATES OF AMERICA,            )   Case No.:  08cr1969-JM
                                         )
12                    Plaintiff,         )   Date:     September 12, 2008
                                         )   Time:     1:30 p.m.
13  v.                                   )
                                         )   **NOTICE OF MOTIONS AND**
14  MANLEY SMITH (2),                    )   **MOTIONS TO:**
                                         )
15                    Defendant.         )   **(1) DISMISS THE INDICTMENT FOR**
                                         )   **    FAILURE TO PRESENT EXCULPATORY**
16                                       )   **    EVIDENCE TO THE GRAND JURY AND**
                                         )   **    ORDER DISCLOSURE OF GRAND JURY**
17                                       )   **    TRANSCRIPTS;**
                                         )   **(2) SUPPRESS STATEMENTS;**
18                                       )   **(3) SUPPRESS EVIDENCE OBTAINED IN**
                                         )   **    VIOLATION OF THE FOURTH**
19                                       )   **    AMENDMENT;**
                                         )   **(4) SEVER DEFENDANTS;**
20                                       )   **    AND,**
                                         )   **(5) GRANT LEAVE TO FILE FURTHER**
21  _____ )   **    MOTIONS**

22  TO:      KAREN P. HEWITT, UNITED STATES ATTORNEY; AND
           MARK CONOVER, ASSISTANT UNITED STATES ATTORNEY:
23

24       **PLEASE TAKE NOTICE** that on September 12, 2008, at 1:30 p.m., or as soon thereafter as

25  counsel may be heard, the accused, Manley Smith, by and through his attorneys, Jason I. Ser and Federal

26  Defenders of San Diego, Inc., will ask this Court to enter an order granting the motions outlined below.

27  //

28  //

                                                                              08cr1969-JM

1

## MOTIONS

2      Defendant, Mr. Smith, by and through his attorneys, Jason I. Ser and Federal Defenders of San

3  Diego, Inc., pursuant to the United States Constitution, the Federal Rules of Criminal Procedure, and all

4  other applicable statutes, case law and local rules, hereby moves this Court for an order to:

5      (1)    Dismiss the Indictment for Failure to Present Exculpatory Evidence to the Grand Jury and
              Order Disclosure of Grand Jury Transcripts;
6      (2)    Suppress Statements;
       (3)    Suppress Evidence Obtained in Violation of the Fourth Amendment;
7      (4)    Sever Defendants; and,
       (5)    Grant Leave to File Further Motions.

8

9      These motions are based upon the instant motions and notice of motions, the attached statement of

10 facts and memorandum of points and authorities, and any and all other materials that may come to this

11 Court's attention at or before the time of the hearing on these motions.

12                                          Respectfully submitted,

13

                                            _/s/ Jason I. Ser_____
14 DATED: August 29, 2008                   JASON I. SER
                                            Federal Defenders of San Diego, Inc.
15                                          Attorneys for Mr. Smith
                                            E-mail:  jason_ser@fd.org
16

17

18

19

20

21

22

23

24

25

26

27

28

1   **JASON I. SER**
    California State Bar No. 201816
2   FEDERAL DEFENDERS OF SAN DIEGO, INC.
    225 Broadway, Suite 900
3   San Diego, California 92101-5008
    Telephone: (619) 234-8467
4   jason_ser@fd.org

5   Attorneys for Mr. Smith

6

7

8                       UNITED STATES DISTRICT COURT

9                      SOUTHERN DISTRICT OF CALIFORNIA

10                     **(HONORABLE JEFFREY T. MILLER)**

11  UNITED STATES OF AMERICA,          )   Case No.: 08cr1969-JM
                                       )
12              Plaintiff,             )   Date:    September 12, 2008
                                       )   Time:    1:30 p.m.
13  v.                                 )
                                       )
14  MANLEY SMITH (2),                  )   **STATEMENT OF FACTS AND POINTS AND**
                                       )   **AUTHORITIES IN SUPPORT OF MOTIONS**
15              Defendant.             )
                                       )
16  ─────────────────────────────────

17                                  **I.**

18                       **STATEMENT OF FACTS**[1]

19         Mr. Smith incorporates by reference the statement of facts previously provided to the Court.  He

20  provides the following statement in support of the instant motions.

21         At approximately 1:45 p.m., Ortiz and other agents arrested Mr. Smith at the Wackenhut office at

22  the Border Patrol station.  In effecting the arrest, three plain clothed Border Patrol officers entered the office

23  all holding a firearm in one hand, with the weapon at their side pointing downward toward the ground.  At

24  least one agent yelled in a loud voice telling Mr. Smith not to move, with at least two of the agents grabbing

25  Mr. Smith, pushing him face down on his desk with hands on the back of his neck and back.  By his wrists,

26  ─────────────────

27         [1] The following statement of facts is based on discovery provided to date.  Accordingly, the facts
    alleged in these motions are subject to elaboration and/or modification at the time these motions are
28  heard.  Mr. Smith reserves the right to take a position contrary to the following statement of facts at the
    motions hearing and at trial.  If necessary, Mr. Smith will supplement the instant motion with
    declarations.

his hands were yanked strongly behind his back and handcuffs were put in place. While escorting Mr. Smith out of the building, subsequent to his arrest, Mr. Smith allegedly stated "Oh I know what this is about, I know now."

Mr. Smith was escorted on foot to another building on the Border Patrol grounds by the same three officers, in handcuffs, where he remained handcuffed alone in a small room for approximately 40 minutes. After that approximately 40 minute period, Mr. Smith was taken to another small room, where his handcuffs were changed and he was re-handcuffed to a cinder-block positioned on the floor. He remained handcuffed to the cinder-block in that room until just minutes prior to the commencement of the interrogation at approximately 5:47 p.m. Prior to the videotaped interrogation, the undercover agent who had posed as the alien entered the room three to four times and each time asked Mr. Smith if he was ready to tell the truth, ordered him to state what was going on and to admit he was a part of it. The agent would position himself in a chair approximately 1 meter from Mr. Smith; nobody else was present in the room during these interactions. In response to the agent's statements, Mr. Smith made statements. At one point, during one of the interactions, Mr. Smith explained to the agent what he would later state during the videotaped interrogation. Unlike the videotaped statement, however, the undercover agent's questions were not preceded by any warnings pursuant to <u>Miranda v. Arizona</u>, 384 U.S. 436 (1966).

At approximately 5:47 p.m., and while being videotaped, agents advised Mr. Smith of his rights pursuant to <u>Miranda</u>, 384 U.S. 436. Mr. Smith purportedly waived his rights and made statements in response to questioning by the agents. During that session, Mr. Smith explained his work schedule on the day of his arrest, including his return to the Border Patrol compound in Chula Vista where he switched from driving a Wackenhut van to a Wackenhut jeep. Just as he began to drive the jeep from the gas pump area of the compound to his office, the bus driven by Transportation Office Hayes arrived. Mr. Saint got off the bus and flagged him down. Mr. Saint tells him he has two prisoners - kickbacks from the port of entry who were not Mexican citizens - he needs to take and loads them into the jeep. Mr. Smith asked if he was taking them to the CHU (a detention building on the compound). Mr. Saint told him no and that they offered him $5,000. Mr. Smith reacted by saying something along the line of oh really or right, then okay and finally I got my car here. Immediately after telling agents he said this, he explained that Mr. Saint always jokes about such things and that the kickbacks from the border always offer something. Mr. Saint also mentioned

1   something to Mr. Smith about an old landlord.  Mr. Saint told the interrogating agents that he was joking

2   around in telling Mr. Saint he had his car there.  In response to the interrogating agent's question

3   "jokingly?", Mr. Smith stated "Yes, sir."  Mr. Smith said that the trip from the gas tanks to his office was

4   about twelve seconds, that he got out at his office and saw Mr. Saint drive the jeep around the corner in the

5   direction of the CHU.  He then went into his office.  Mr. Smith continually told the interrogating agents that

6   his statement was intended as a joke and he never intended to use or provide the car to Mr. Saint.  The

7   videotape cuts out before the end of the statement by Mr. Smith.  All the while during the interrogation,

8   Mr. Smith remained handcuffed to the cinder-block on the floor.

9        Five to ten minutes after this session, the undercover agent along with another agent returned to the

10  room where Mr. Smith remained handcuffed to the cinder-block.  They ridiculed him, told him he would

11  lose his job and that the knew how he bought his Jaguar.  In response to this, Mr. Smith continued to insist

12  he was only a witness.

13                                             **II.**

14  **THE COURT SHOULD DISMISS THE INDICTMENT FOR FAILURE TO PRESENT
    EXCULPATORY EVIDENCE TO THE GRAND JURY AND ORDER DISCLOSURE OF**
15  **GRAND JURY TRANSCRIPTS**

16       Section 939.71 of the California Penal Code states in pertinent part:

17       Exculpatory evidence; duties of prosecutor

18       If the prosecutor is aware of exculpatory evidence, the prosecutor *shall inform the grand jury*
         of its nature and existence.  Once the prosecutor has informed the grand jury of exculpatory
19       evidence pursuant to this section, the prosecutor shall inform the grand jury of its duties
         under Section 939.7.  If a failure to comply with the provisions of this section results in
20       substantial prejudice, it shall be grounds for dismissal of the portion of the indictment related
         to that evidence.
21

22  Cal. Pen. Code § 939.71(a) (emphasis added).  Pursuant to 28 U.S.C. § 530B(a), entitled ethical standards

23  for attorneys for the government, "[a]n attorney for the Government shall be subject to State laws and rules,

24  and local Federal Court rules, governing attorneys in each State where such attorney engages in that

25  attorney's duties, to the same extent and in the same manner as other attorneys in that State."  28 U.S.C.

26  § 530B(a).  The "shall" language in § 530B(a) makes California ethical obligation to present exculpatory

27  evidence to a grand jury binding on federal prosecutors at the United States Attorney's Office for the

28  Southern District of California.  Because the government did not  present exculpatory evidence to the grand

1   jury in this case, i.e., Mr. Smith's statement to interrogating agents that his comment to Mr. Saint in the

2   Wackenhut Jeep was a joke, and that he never intended to assist with the alleged alien in any manner or with

3   Mr. Saint's completion of the alien smuggling venture, dismissal is warranted.

4        In Johnson v. Superior Court of San Joaquin County, 15 Cal.3d 248 (1975), the California Supreme

5   Court interpreted California Penal Code § 939.7, a precursor to the current § 939.71(a), and the obligations

6   it imposed upon prosecutors seeking indictment before a grand jury.  The court held that "when a district

7   attorney seeking an indictment is aware of evidence reasonably tending to negate guilt, he is obligated under

8   section 939.7 to inform the grand jury of its nature and existence, so that the grand jury may exercise its

9   power under the statute to order the evidence produced."  Id. at 254.  The state court characterized the grand

10  jury as the "great inquest" between the prosecuting body of government and the citizen; as such, it shall

11  "make accusations only upon sufficient evidence of guilt, and to protect the citizen against unfounded

12  accusation, whether from the government, from partisan passion, or private malice."  Id.  To infuse the grand

13  jury's power "to protect the citizen against unfounded accusation," the court strictly read a district attorney's

14  obligations pursuant to Cal. Pen. Code § 939.7 as including the duty to "fully and fairly present" evidence

15  to the grand jury.  Id. at 255.

16       The circumstances in Johnson are similar to the facts present in the present case.  There, along with

17  a co-defendant, the petitioner had been arrested for the sale of amphetamine tablets to an undercover

18  narcotics agent.  Id. at 251.  Before his arrest, however, the petitioner had pled guilty in another drug case

19  and received a beneficial sentencing recommendation from the government on the condition that he

20  cooperate in other drug prosecutions.  Id. at 252.  The petitioner argued that the district attorney failed to

21  present evidence of this agreement to the grand jury and his testimony at a preliminary hearing that he was

22  in the vicinity of the drug sale to inform on the drug dealer.  Id. at 252-53.  The magistrate court held that

23  this omission was fatal and dismissed the charges.  Id. at 252.  Based upon its interpretation of § 939.7, the

24  California Supreme Court agreed with the magistrate's resolution of the conflict.

25       In this case, during the course of interrogation, Mr. Smith informed agents that he thought Mr. Saint

26  was joking about going through with actually smuggling the men in the jeep for the $5,000 Mr. Saint

27  mentioned.  In fact, Mr. Smith indicated that Mr. Saint always joked like that.  As a result, Mr. Smith

28  explained that his response about having his vehicle present at the Border Patrol grounds was a joke and

1    as the interrogating agent put it, a flippant remark.  Mr. Smith further stated that he never offered to go get

2    his vehicle, that he made a mistake by making that joking comment and had no intention on following

3    through.  Accordingly, because the prosecution was aware of this material exculpatory evidence, the grand

4    jury assistant should have so informed the grand jury.  Failure to do so constitutes a failure to "fully and

5    fairly present" evidence as required pursuant to California Penal Code § 939.71(a) and violates due process

6    resulting in substantial prejudice.  The Court, accordingly, should dismiss the indictment.

7        The government will likely argue that the Supreme Court's decision in United States v. Williams,

8    504 U.S. 36 (1992), is dispositive of whether it must present exculpatory evidence to the grand jury.  It

9    would be difficult to imagine a less relevant precedent; Williams was premised upon the lack of a statutory

10   mandate to support the exculpatory evidence rule, while Mr. Smith's motion is based upon precisely the

11   authority lacking in Williams.  Here, the State of California has promulgated a rule requiring disclosure of

12   exculpatory evidence and Congress has incorporated that rule.  Thus, Williams is distinguishable.

13       Because Williams expressly acknowledged legislative authority to regulate grand jury practice, see

14   id. at 55, it should be of great consequence to this Court in deciding the issue that the California state

15   legislature saw fit to draft and enact just such a disclosure requirement.  See Cal. Penal Code § 939.71(a).

16   Congress has applied this rule, among others, to federal prosecutors.  See 28 U.S.C. § 530B(a) (applying

17   State rules to attorneys in federal court within the State jurisdiction).  Section 530B was enacted in late

18   1998, while § 939.71(a) was codified in mid-1997.  Congress, thus, is presumed to enact new law with

19   knowledge of existing statutes.  See Whitfield v. United States, 543 U.S. 209, 216 (2005) ("Congress is

20   presumed to have knowledge of the governing rule"); see also Williams v. Taylor, 529 U.S. 420, 434 (2000)

21   (same).  Section 939.71(a) placed an affirmative, and mandatory duty, upon the prosecutor to present

22   exculpatory evidence it is aware of to the grand jury.  Id. (Section 939.71(a) states that the prosecutor "shall

23   inform the grand jury of its nature and existence").  Despite the government's repeated claims in the past

24   that it is under no legal obligation to present exculpatory evidence to a federal grand jury panel when

25   seeking an indictment, it cites no case law permitting it to act without regard to the enactment by the

26   California state legislature.

27       In fact, the United States Attorneys' Manual, too, provides precisely what the California legislature

28   does in remarkably similar language.

9-11.233 Presentation of Exculpatory Evidence

In <u>United States v. Williams</u>, 112 S. Ct. 1735 (1992), the Supreme Court held that the Federal courts' supervisory powers over the grand jury did not include the power to make a rule allowing the dismissal of an otherwise valid indictment where the prosecutor failed to introduce substantial exculpatory evidence to a grand jury. It is the policy of the Department of Justice, however, that when a prosecutor conducting a grand jury inquiry is personally aware of substantial evidence that directly negates the guilt of a subject of the investigation, the prosecutor must present or otherwise disclose such evidence to the grand jury before seeking an indictment against such a person. While a failure to follow the Department's policy should not result in dismissal of an indictment, appellate courts may refer violations of the policy to the Office of Professional Responsibility for review.

<u>Available at</u> http://www.usdoj.gov/usao/eousa/foia_reading_room/usam/title9/11mcrm.htm#9-11.233.

Further 22 C.F.R. § 77.3, which is entitled "Application of 28 U.S.C. 530B," provides:

In all criminal investigations and prosecutions . . . attorneys for the government shall conform their conduct and activities *to the state rules and laws, and* federal local court rules, governing attorneys in each State where such attorney engages in that attorney's duties, to the same extent and in the same manner as other attorneys in that State.

(emphasis added). The express command to conform conduct "to the state rules and laws" in addition to federal ones disposes of the government's argument that § 939.71(a) only applies to state grand juries. If that logic dictated, there would be no discernable need for either the federal regulation of even the statute.

In light of the foregoing arguments Mr. Smith believes that the prosecution was required by federal law - § 530B(a) - as well as state law to have disclosed exculpatory evidence based upon his statements during interrogation. The prosecution plainly possessed such information, but failed to present it.

At the least, grand jury transcripts should be ordered disclosed. The Court may order disclosure of grand jury proceedings "at the request of a defendant who shows that a ground may exist to dismiss the indictment because of a matter that occurred before the grand jury." Fed. R. Crim. P. 6(e)(3)(E)(ii). Mr. Smith has presented a ground for dismissal of the indictment satisfying the rule's requirement.

//
//
//
//
//

1

**III.**

2

**THIS COURT SHOULD SUPPRESS ANY STATEMENTS MADE BY
MR. SMITH**

3

4

**A.    Mr. Smith's Pre-*Miranda* Statements Must Be Suppressed Because They Were
Elicited As the Result of Custodial Interrogation and Were Involuntary.**

5    The prosecution may not use statements, whether exculpatory or inculpatory, stemming from a

6    custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective

7    to secure the privilege against self-incrimination. Miranda v. Arizona, 384 U.S. 436, 444 (1966). Custodial

8    interrogation is questioning initiated by law enforcement officers after a person has been taken into custody

9    or otherwise deprived of his freedom of action in any significant way. Id. See Orozco v. Texas, 394 U.S.

10    324, 327 (1969). Once a person is in custody, Miranda warnings must be given prior to any interrogation.

11    See United States v. Estrada-Lucas, 651 F.2d 1261, 1265 (9th Cir. 1980). Those warnings must advise the

12    defendant of each of his or her "critical" rights. United States v. Bland, 908 F.2d 471, 474 (9th Cir. 1990).

13    In order to be voluntary, a statement must be the product of a rational intellect and free will.

14    Blackburn v. Alabama, 361 U.S. 199, 208 (1960). In determining whether a defendant's will was overborne

15    in a particular case, the totality of the circumstances must be considered. Schneckloth v. Bustamonte, 412

16    U.S. 218, 226 (1973). Some factors taken into account have included the youth of the accused, his lack of

17    education, his low intelligence, the lack of any advice to the accused of his constitutional rights, the length

18    of the detention, the repeated and prolonged nature of the questioning, and the use of physical punishment

19    such as the deprivation of food or sleep. Id. The fact that the statement occurred subsequent to the six-hour

20    safe harbor period also is of consequence. See 18 U.S.C. § 3501.

21    A confession is deemed involuntary whether coerced by physical intimidation or psychological

22    pressure. Townsend v. Sain, 372 U.S. 293, 307 (1962). "The test is whether the confession was `extracted

23    by any sort of threats or violence, [or] obtained by any direct or implied promises, however slight, [or] by

24    the exertion of any improper influence.'" Hutto v. Ross, 429 U.S. 28, 30 (1976) (quoting Bram v. United

25    States, 168 U.S. 532, 542-43 (1897)). Accord, United States v. Tingle, 658 F.2d 1332, 1335 (9th Cir. 1981).

26    Because the government failed to comply with the former requirement - that Mr. Smith first be

27    advised pursuant Miranda - all of Mr. Smith's pre-Miranda statements must be suppressed.

28

1    Additionally, all pre-<u>Miranda</u> statements (including the one made at the time of arrest) were

2    involuntary in light of the manner of arrest, i.e., three agents in a small office, guns drawn and in hand, and

3    the physical force used to effect the arrest.  The prolonged, isolated detention, while Mr. Smith was

4    handcuffed to a cinder-block on the floor for more than several hours, created a coercive atmosphere.  The

5    harassing recitations by the undercover agent in the room with Mr. Smith that elicited responses from him

6    prior to any <u>Miranda</u> warnings only compounded this atmosphere.  Furthermore, this interrogation began

7    with Mr. Smith still in handcuffs attached to a cinder-block on the floor.  Finally, as is clear from

8    Mr. Smith's statement to the agents, he had never been in position before because he had never been

9    arrested.

10    **B.    The Court Must Suppress Mr. Smith's Alleged Post-*Miranda* Statements.**

11    **1.    The Interrogating Agent's Pre-*Miranda* Interrogation Violated *Seibert***
     **and Resulted in Involuntary Statements.**

12

13    A defendant's post-<u>Miranda</u> statements may be inadmissible if law enforcement officers use a two-

14    step interrogation process.  <u>See</u> <u>Missouri v. Seibert</u>, 542 U.S. 600, 617 (2004).  A two-step interrogation

15    involves eliciting an unwarned confession, administering the <u>Miranda</u> warnings and obtaining a waiver of

16    <u>Miranda</u> rights, and then eliciting a repeated confession.  <u>See</u> <u>id.</u> at 609-10.  If the interrogators deliberately

17    employ the two-step strategy, the district court must suppress post-warning statements unless the

18    interrogators take curative measures to apprise the defendant of his rights; if the two-step method is not

19    deliberate, the post-warning statements are admissible if voluntarily made.  <u>Id.</u> at 622 (Kennedy, J.,

20    concurring); <u>see also</u> <u>United States v. Williams</u>, 435 F.3d 1148, 1157-58 (9th Cir.2006) (Justice Kennedy's

21    concurrence in <u>Seibert</u> is the Court's holding because it is narrowest grounds with which majority of the

22    Court would agree).

23    In <u>Williams</u>, the Court candidly stated that "[o]nce a law enforcement officer has detained a suspect

24    *and subjects him to interrogation* . . . there is rarely, if ever, a legitimate reason to delay giving a <u>Miranda</u>

25    warning until after the suspect has confessed."  <u>Id.</u> at 1159 (emphasis in original)..  Indeed, "the most

26    plausible reason for the delay in an *illegitimate* one, which is the interrogator's desire to weaken the

27    warning's effectiveness."  <u>Id.</u> (emphasis in original).  The effect of the two-step interrogation is to minimize

28

1   the meaning of "midinterrogation" <u>Miranda</u> warnings because "inculpatory statements have already been

2   obtained." <u>Id.</u> at 1159-60.

3          Whether interrogators acted deliberately in applying a two-step method interrogation is critical when

4   assessing the effectiveness of <u>Miranda</u>.  Deliberateness may be found if "objective evidence and any

5   available subjective evidence, such as an officer's testimony, support an inference that the two-step

6   interrogation procedure was used to undermine the <u>Miranda</u> warning." <u>Id.</u> at 1158.  Objective evidence

7   includes "the timing, setting and completeness of the prewarning interrogation, the continuity of police

8   personnel and the overlapping content of the pre-and post-warning statements." <u>Id.</u> at 1159 (citing <u>Seibert</u>,

9   542 U.S. at 615).

10         "When an interrogator has deliberately employed the two-step strategy, <u>Seibert</u> requires the court

11  then to evaluate the effectiveness of the midstream <u>Miranda</u> warning to determine whether the postwarning

12  statement is admissible." <u>Williams</u>, 435 F.3d at 1160 (citing <u>Seibert</u>, 542 U.S. at 615).  The Court must

13  consider "objective circumstances . . . 'bear[ing] on whether <u>Miranda</u> warnings delivered midstream could

14  be effective enough to accomplish their object'" and whether any curative measures "ensure[d] that a

15  reasonable person in the suspect's situation would understand the import and effect of the <u>Miranda</u> warning."

16  <u>Williams</u>, 435 F.3d at 1160 (quoting <u>Seibert</u>, 542 U.S. at 622).  The circumstances include "(1) the

17  completeness and detail of the prewarning interrogation, (2) the overlapping content of the two rounds of

18  interrogation, (3) the timing and circumstances of both interrogations, (4) the continuity of police personnel,

19  (5) the extent to which the interrogator's questions treated the second round of interrogation as continuous

20  with the first and (6) whether any curative measures were taken." <u>Id.</u>

21         Here, there is no question that the interrogating agents employed a deliberate two-step interrogation

22  in securing Mr. Smith's waiver of <u>Miranda</u> and that no curative measures "ensure[d]" that he would have

23  understood his <u>Miranda</u> rights.  As to the former, most of the factors identified in <u>Williams</u> support a finding

24  of deliberateness on the part of the agents.  First, though not in any reports, unsurprisingly, Mr. Smith's

25  interrogation at the hands of the undercover agent covered the same topics addressed during the post-

26  <u>Miranda</u>, videotaped interrogation.  In fact, the agents in both sessions questioned him about the events of

27  that day leading to his arrest, including the seconds long trip in the Wackenhut jeep with Mr. Saint, the

28  undercover agent and the alleged alien, and Mr. Smith told the undercover agent the same things he told the

1    agents during the videotaped interrogation.  Thus, the first two factors in <u>Williams</u> militate in Mr. Smith's

2    favor.  The interrogation with the undercover agent began and ended sometime between approximately 2:30

3    p.m. and 5:47 p.m.  The agents began the videotaped interrogation at 5:47 p.m., in the exact same room.

4    During the interim, which lasted at most just hours, Mr. Smith remained handcuffed to the cinder-block in

5    the same interrogation room.   Thus, for all intensive purposes, the two interrogation sessions were

6    successive and uninterrupted.   Furthermore, the continuity of police personnel is irrefutable.  Although the

7    undercover agent was not present during the videotaped session, that agent and the two agents present in

8    the room during the videotaped session all are Border Patrol agents.  They all work for the same government

9    agency and all had the same goal in this case.  Their focus remained on Mr. Smith both before and after

10   <u>Miranda</u> was provided.  Thus, the third and fourth factors, too, militate in Mr. Smith's favor.

11       No curative measures were taken.  The agents never told Mr. Smith that his pre-<u>Miranda</u> statement

12   would be inadmissible.  They never told him that the questioning post-<u>Miranda</u> was separate and distinct

13   from the first round of interrogation.   The videotaped statement bears this out.  Finally, the agents'

14   apparently knew of their obligation to provide <u>Miranda</u> warnings to Mr. Smith.  They brought with them

15   to the interrogation room a copy of the advice of rights card from which one read the warnings.  Their

16   forethought in doing so is highly indicative of an intent to get Mr. Smith talking, and if possible confessing,

17   before giving him <u>Miranda</u>.

18       The objective facts make it apparent that the agents deliberately chose not to provide Mr. Smith with

19   his <u>Miranda</u> warnings prior to interrogating him.  Accordingly, the question becomes whether <u>Miranda</u> as

20   given midstream were effective.  All the same objective facts discussed above militate for the conclusion

21   that the warnings were ineffective.  Additionally, the agents appeared to have treated the second round of

22   interrogation as continuous with the first.  As indicated above, there was little break taken during the course

23   of the two interrogations and Mr. Smith remained handcuffed in the same position between each round.

24       These circumstances completely negate the comprehensibility and efficacy of the <u>Miranda</u> warnings

25   to the point that a reasonable person in Mr. Smith's shoes would not have understood them to convey a

26   message that he retained a choice about continuing to talk to the same agents.

27

28

1    Accordingly, the Court should suppress not only the pre-<u>Miranda</u> statements as discussed above, but

2    any and all post-<u>Miranda</u> statements based upon the holding in <u>Seibert</u> and Supreme Court's chastisement

3    of law enforcement's "question-first" strategy.

4        **2.**    **Alternatively, the Government must Still Prove That** <u>**Miranda**</u>
    **Warnings Were Properly Administered Prior to the Second**

5        **Interrogation Session.**

6    Even if the Court denies Mr. Smith's arguments based upon <u>Seibert</u>, the government still must

7    demonstrate the use of procedural safeguards effective to secure the privilege against self-incrimination.

8    <u>Miranda v. Arizona</u>, 384 U.S. 436, 444 (1966).  Until that is done, post-<u>Miranda</u> statements remain

9    inadmissible.

10        **3.**    **Further, the Government Must Demonstrate That Any Alleged Waiver**
    **of Mr. Smith's Rights Was Voluntary, Knowing, and Intelligent.**

11

12    When interrogation occurs without the presence of an attorney and a statement is taken, a heavy

13    burden rests on the government to demonstrate that the defendant intelligently and voluntarily waived his

14    privilege against self-incrimination and his right to retained or appointed counsel. <u>Miranda</u>, 384 U.S. at 475.

15    It is undisputed that, to be effective, a waiver of the right to remain silent and the right to counsel must be

16    made knowingly, intelligently, and voluntarily.  <u>Schneckloth v. Bustamonte</u>, 412 U.S. 218 (1973).  The

17    standard of proof for a waiver of these constitutional rights is high.  <u>Miranda</u>, 384 U.S. at 475.  <u>See</u> <u>United</u>

18    <u>States v. Heldt</u>, 745 F.2d 1275, 1277 (9th Cir. 1984) (the burden on the government is great, the court must

19    indulge every reasonable presumption against waiver of fundamental constitutional rights).

20    The validity of the waiver depends upon the particular facts and circumstances surrounding the case,

21    including the background, experience, and conduct of the accused.  <u>Edwards v. Arizona</u>, 451 U.S. 477, 472

22    (1981); <u>Johnson v. Zerbst</u>, 304 U.S. 458, 464 (1983).  <u>See also</u> <u>United States v. Heldt</u>, 745 F.2d at 1277;

23    <u>United States v. McCrary</u>, 643 F.2d 323, 328-29 (9th Cir. 1981).

24    In <u>Derrick v. Peterson</u>, 924 F.2d 813 (9th Cir. 1990), the Ninth Circuit confirmed that the issue of

25    the validity of a <u>Miranda</u> waiver requires a two prong analysis:  the waiver must be both (1) voluntary, and

26    (2) knowing and intelligent.  <u>Id.</u> at 820.  The voluntariness prong of this analysis "is equivalent to the

27    voluntariness inquiry under the [Fifth] Amendment . . . ." <u>Id.</u>  <u>See infra</u> pages 10-11.

28

08cr1969-JM

1    The second prong, however, requiring that the waiver be "knowing and intelligent," mandates an

2    inquiry into whether "the waiver [was] made with a full awareness both of the nature of the right being

3    abandoned and the consequences of the decision to abandon it." Id. at 820-21 (quoting Colorado v. Spring,

4    479 U.S. 564, 573 (1987)). This inquiry requires that the court determine whether "the requisite level of

5    comprehension" existed before the purported waiver may be upheld. Id. Thus, "[o]nly if the `totality of the

6    circumstances surrounding the interrogation' reveal both an uncoerced choice and the requisite level of

7    comprehension may a court properly conclude that the Miranda rights have been waived." Id. (quoting

8    Colorado v. Spring, 479 U.S. at 573) (emphasis in original) (citations omitted)).

9    Under prevailing Ninth Circuit law, the Government bears the burden of demonstrating a Miranda

10   waiver by clear and convincing evidence. See Schell v. Witek, 218 F.3d 1017 (9th Cir. 2000) (en banc)

11   (constitutional rights may ordinarily be waived only if it can be established by clear and convincing

12   evidence that the waiver is voluntary, knowing, and intelligent) (citations omitted). Moreover, this Court

13   must "indulge every reasonable presumption against waiver of fundamental constitutional rights." Id.

14   (citations omitted). Unless and until the prosecution meets its burden of demonstrating through evidence

15   that adequate Miranda warnings were given and that the defendant knowingly and intelligently waived his

16   rights, no evidence obtained as result of the interrogation can be used against the defendant. Miranda, 384

17   U.S. at 479.

18   Until the government meets its evidentiary burden of showing that the Miranda warnings were

19   sufficient or that the Miranda rights were knowingly or intelligently waived, the statements obtained from

20   Mr. Smith must be suppressed. In light of the events surrounding his arrest as discussed herein, as well as

21   the pre-Miranda questioning and hours long delay before Miranda with Mr. Smith handcuffed to a cinder-

22   block on the floor, he believes he has at least set forth facts to warrant a hearing on the matter or justify

23   suppression.

24       **4.    Any Post-Miranda Statements by Mr. Smith Were Involuntary.**

25   Even when the procedural safeguards of Miranda have been satisfied, a defendant in a criminal case

26   is deprived of due process of law if the conviction is founded upon an involuntary confession. Arizona v.

27   Fulminante, 499 U.S. 279 (1991); Jackson v. Denno, 378 U.S. 368, 387 (1964). The government bears the

28

1    burden of proving by a preponderance of the evidence that a confession is voluntary. <u>Lego v. Twomey</u>, 404

2    U.S. 477, 483 (1972).

3    In the instant matter, at least two impediments exist for the government to demonstrate that

4    Mr. Smith's statements were voluntary.  First, an implied promise of *not charging* him criminally preceded

5    his statements to the interrogating agents.  Second, Mr. Smith's military history as a distinguished Marine

6    coupled with his being questioned by what amounted to a superior officer rendered his statements

7    involuntary.

8        **a.    The Interrogating Agent Informed Mr. Smith that a
              Decision Whether or Not to Charge Existed.**

9

10    Immediately after the <u>Miranda</u> warnings were provided, the interrogating agent explained to

11    Mr. Smith that it was not his call about how much time he faced, whether he would be charged, *or would*

12    *not be charged*.  Those decisions were for others to make.  Clearly, the suggestion that Mr. Smith potentially

13    would not be charged depending upon the extent of how much he talked and told them fostered Mr. Smith

14    into making statements.  In light of this implied promise, of a significant benefit, Mr. Smith's statements

15    were involuntary.

16        **b.    Mr. Smith's Statements Were the Product of an
              Inherently Coercive Setting and Were Made In Response
              to Questioning by a Superior Officer.**

17

18    The unique environment which emanates from military relationships creates an inherently coercive

19    setting of a soldier/officer being questioned by superior military officers.  Because of a subordinate military

20    person's obligation to respond to the command of his superior, merely asking a question under certain

21    circumstances *may be equivalent to a command*.  <u>See</u> <u>United States v. Jones</u>, 24 M.J. 367, 369 (CMA 1987).

22    The coercive effect of the "subtle pressures which exist in military society," must be considered.  <u>United</u>

23    <u>States v. Armstrong</u>, 9 M.J. 374, 378 (C.M.A.1980).  <u>Jones</u> referred to these pressures as "*i.e.*, the ethic of

24    discipline and obedience and the pervasive presence of superior authority." <u>United States v. Jones</u>, 19 M.J.

25    961, 967 (ACMR 1985).  Perhaps, however, it is best explained by <u>United States v. Armstrong</u>, 9 M.J. 374

26    (C.M.A.1980):

27        Conditioned to obey, a serviceperson asked for a statement about an offense may feel
          himself to be under a special obligation to make such a statement.  Moreover, he may be

28

1  especially amenable to saying what he thinks his military superior wants him to say -
2  whether it is true or not.

3  Id. at 378.  Similarly, United States v. Swift, 53 M.J. 439, 445 (CAAF 2000), explained:

4      In the armed forces, a person learns from the outset of recruit training to respond promptly
       to the direct orders and the indirect expectations of superiors and others, such as military
5      police, who are authorized to obtain official information. Failure to respond to direct orders
       can result in criminal offenses unknown in civilian life . . . .
6
7      In such an environment, a question from a superior or investigator is likely to trigger a direct
       response without any consideration of the privilege against self-incrimination.

8  Id. at 445.  Admittedly, Swift went on to state "The Article 31(b) warning [which is similar to Miranda]

9  requirement provides members of the armed forces with statutory assurance that the standard military

10 requirement for a full and complete response to a superior's inquiry does not apply in a situation when the

11 privilege against self-incrimination may be invoked."  Id.; but see United States v. McCaig, 32 M.J. 751,

12 753 (ACMR 1991) (recognizing the inherent powers of the office of First Sergeant when questioning a

13 private); United States v. Kruempelman, 21 M.J. 725, 726-27 (ACMR 1985) (recognizing subtle pressures

14 created by rank and duty in military society which do no exist in civilian society); United States v. Ward,

15 19 M.J. 505, 507-08 (AFCMR 1984) (consent to search is not freely given if it amounts to no more than

16 acquiescence to the orders of a superior officer); United States v. Duga, 10 M.J. 206, 209 (CMA 1981)

17 (recognizing the pressures of superior rank upon one subject to military law such that the mere asking of

18 a question may be deemed to be a command).

19      Mr. Smith's statements to the ICE Special Agents must be suppressed because they were

20 involuntary.  The inherently coercive setting of an officer, and former Marine Corps soldier, being

21 questioned by what is tantamount to superior officers without being allowed to first consult with an attorney

22 are events that render the statements involuntary. Wackenhut itself has a pseudo-military like structure with

23 an established chain of command and top-down authority scheme.  Cf. Lincoln v. Wackenhut Corp., 867

24 P.2d 701 (1994) ("As a Wackenhut employee, Lincoln was required to follow a 'chain of command' to

25 address security problems or work-related incidents").  During his interrogation, Mr. Smith identified

26 various individuals in his office at Sergeant or Lieutenant, with superior ranks and command to his status

27 as supervisor of the day shift.  Wackenhut's officials in the transport department in this case are referred to

28 as Transportation *Officers*, as opposed to officials. The Wackenhut officers wear uniforms, bear credentials,

1    etc. Furthermore, as a federal contractor, in this case to the United States Border Patrol, Wackenhut officers

2    are delegated responsibilities by that federal agency, which implicitly oversees Wackenhut's

3    duties/performance.

4         In addition to the command structure of Wackenhut, Mr. Smith's background as a decorated Marine

5    Corps soldier also plays into the calculus of whether his statements were voluntary. As the case law above

6    makes clear, this background only could have exasperated the involuntary nature of the statements.

7    Mr. Smith was a member of the corp from 1987, upon enlistment, through 1996, when he received an

8    honorable discharge. He ascended the ranks and in his final years was an instructor at the Corps's cold

9    weather unit training branch. Mr. Smith's repeated responses to some questions with a"yes, sir,"

10   demonstrates a superior/inferior officer relationship and the latter treating the former with due deference.

11   Cf. United States v. Elfayoumi, 66 M.J. 534, 355 (USAF 2008) (providing selection from questioning where

12   many responses by junior officer to senior one included "yes sir").

13        Each of these factors have been held to impact the voluntariness of a incriminating statement. See

14   e.g., Lego, 404 U.S. at 478 (to be admissible, a confession must be voluntary and not the outcome of

15   coercion which the Constitution forbids). Because Mr. Smith was put in a position of being questioned by

16   two officers of superior rank, one of which was the lead agent in the investigation, and because Mr. Smith

17   was afforded no attorney to counsel him in this situation, the incriminating statements that he made were

18   involuntary and must be suppressed. Lego, 404 U.S. at 483.

19   **C.    Mr. Smith Requests That This Court Conduct An Evidentiary Hearing.**

20        This Court must make a factual determination as to whether a confession or statements were

21   voluntarily given prior to their admission into evidence. 18 U.S.C. § 3501(a). Where a factual

22   determination is required, courts are obligated by Fed. R. Crim. P. 12 to make factual findings. See

23   United States v. Prieto-Villa, 910 F.2d 601, 606-10 (9th Cir. 1990). Because "'suppression hearings are

24   often as important as the trial itself,'" id. at 609-10 (quoting Waller v. Georgia, 467 U.S. 39, 46 (1984)),

25   these findings should be supported by evidence, not merely an unsubstantiated recitation of purported

26   evidence in a prosecutor's responsive pleading.

27        Under section 3501(b), this Court must consider various enumerated factors in making the

28   voluntariness determination, including whether the defendant understood the nature of the charges against

1  him and whether he understood his rights.  Without the presentation of evidence, this Court cannot

2  adequately consider these statutorily mandated factors. Mr. Smith accordingly requests that this Court

3  conduct an evidentiary hearing pursuant to 18 U.S.C. § 3501(a), to determine, outside the presence of the

4  jury, whether any statements made by the defendant were voluntary.

5                                                    **IV.**

6  **THE COURT SHOULD SUPPRESS THE INFORMATION DERIVED FROM THE SEARCH**
   **OF THE CELLULAR TELEPHONE WITHOUT A WARRANT**

7

8          The Fourth Amendment of the United States Constitution protects "[t]he right of people to be secure

9  in their persons, houses, papers, and effects, against unreasonable searches and seizures."  Warrantless

10 searches are per se unreasonable under the Fourth Amendment subject to only a few specifically established

11 and well delineated exceptions.  Mincey v. Arizona, 437 U.S. 385, 390 (1978).  According to discovery

12 disclosed to defense counsel, agents recovered several cellular telephones subsequent to arrest.  Sometime

13 thereafter, agents searched the memories of those cellular telephones and discovered various names and

14 telephone numbers.  The government may seek to admit such evidence at trial.  The Court should preclude

15 the government from doing so because the warrantless search of the telephone's memory violated Mr.

16 Smith's Fourth Amendment rights.

17         First, this search occurred without a warrant and without Mr. Smith's voluntary consent.  See United

18 States v. Ward, 19 M.J. 505, 507-08 (AFCMR 1984) (consent to search is not freely given if it amounts to

19 no more than acquiescence to the orders of a superior officer).  The government has the burden of proving

20 by clear and positive evidence that an unequivocal and specific consent was given, uncontaminated by any

21 duress or coercion.  See Channel v. United States, 285 F.2d 217, 219, 220 (9th Cir. 1960); Schneckloth v.

22 Bustamonte, 412 U.S. 218, 222 (1973); Bumper v. North Carolina, 391 U.S. 543, 548 (1968).  In United

23 States v. Chan-Jiminez, 125 F.3d 1324 (9th Cir. 1997), the Court summarized the government's burden and

24 factors to be taken into account in determining the voluntariness of consent: "[i]n order to establish the

25 validity of a consent to search, the government bears the heavy burden of demonstrating that the consent

26 was freely and voluntarily given.  Whether consent to search was voluntarily given or not is 'to be

27 determined from the totality of the circumstances.'" Id. at 1327 (quoting Schneckloth v. Bustamonte, 412

28 U.S. at 227); see United States v. Torres-Sanchez, 83 F.3d 1123, 1129 -1130 (9th Cir. 1996); United States

1   v. Al-Azzawy, 784 F.2d 890, 895 (9th Cir.1985), cert. denied, 476 U.S. 1144 (1986); United States v.

2   Alfonso, 759 F.2d 728, 740 (9th Cir.1985).

3          The Ninth Circuit has held that this Court should consider the following factors in determining

4   whether a consent to search is voluntary: (1) whether the person was in custody; (2) whether the officer had

5   his weapon drawn; (3) whether the officers failed to administer Miranda warnings; (4) whether the officer

6   informed the person of his right to refuse consent; and, (5) whether the person was told that a search warrant

7   could be obtained.  See Chan-Jiminez, 125 F.3d at 1327; United States v. Welch, 4 F.3d 761, 763 (9th Cir.

8   1993); United States v. Castillo, 866 F.2d 1071, 1082 (9th Cir.1988).  Using the five factors in Chan-

9   Jiminez, Welch and Castillo as a guide to determine the voluntariness of a consensual search, it becomes

10  quite clear that the facts of the instant case (discussed above) demonstrate that any purported consent to the

11  search of the telephones was not voluntary.  Because the searches occurred without a warrant, and without

12  his voluntary consent, and because no other exception to the warrant requirement applies, Mr. Smith's

13  demands that any evidence seized as a result of this search be suppressed as well as any fruits thereof.

14                                                    **V.**

15  **SIXTH AMENDMENT CONFRONTATION, CROSS-EXAMINATION AND DUE PROCESS**
    **RIGHTS COMPEL SEVERANCE IN THIS CASE**

16

17         The Sixth Amendment guarantees the accused the rights to confront and to cross-examine witnesses

18  against him.  Lilly v. Virginia, 527 U.S. 116, 123-24 (1999); Bruton v. United States, 391 U.S. 123, 126

19  (1968).  This Court has the power to sever Mr. Smith's trial, and thus preserve his rights of confrontation

20  and cross-examination.  U.S. Const. amend VI; Fed. R. Crim. P. 14.

21         "Where testimonial evidence is at issue . . . the Sixth Amendment demands what the common law

22  required: unavailability and a prior opportunity for cross-examination." Crawford v. Washington, 124 S.Ct.

23  1354, 1374 (2004).  Although it declined to offer a "comprehensive definition" of "testimonial," the

24  Crawford court certainly included "police interrogation" in that definition.  Id. at 1364.  The Supreme Court

25  did, however, further define "testimonial" in a case subsequent to Crawford: "[T]o be testimonial, an

26  accused's communication must itself, explicitly or implicitly, relate a factual assertion or disclose

27  information." Hiibel v. Sixth Judicial District Court, 542 U.S. 177, 189 (2004) (quotations in original).

28

Under the definition of "testimonial" set forth in <u>Crawford</u> and <u>Hiibel</u>, the post-arrest statements by Mr. Saint clearly related factual assertions and disclosed information that the government will seek to introduce against Mr. Smith at trial. Such evidence, however, introduced without affording Mr. Smith the right to confront and cross-examine Mr. Saint, will violate Mr. Smith's rights under the Sixth Amendment. Thus, this is not just a <u>Bruton v. United States</u>, 391 U.S. 123 (1968), issue about whether a post-arrest statement implicates Mr. Smith. If statements are testimonial and the defendant has not had a prior opportunity to cross-examine the declarant, then the statements are inadmissible under <u>Crawford</u>. There is nothing in <u>Crawford</u> which suggests that there is a "this would been admissible under <u>Bruton</u>" exception. Indeed, the whole logic of <u>Crawford</u> disproves that thesis. Accordingly, this Court must sever Mr. Smith's trial from that of Mr. Saint.

"It is well-established that the out-of-court statements of a non-testifying defendant, even if admissible against the declarant, may not be used against a jointly tried codefendant unless otherwise independently admissible against that codefendant." <u>United States v. Molina</u>, 407 F.3d 511, 517-18 (1st Cir. 2005) (citing <u>Lilly</u>, 527 U.S. at 124; <u>Bruton</u>, 391 U.S. at 128; and <u>Crawford</u>, 124 S. Ct. at 1374.). <u>Molina</u> specifically recognizes that <u>Crawford</u> displaces the prior case law and holds that the Confrontation Clause categorically bars the introduction of testimonial hearsay unless the accused previously has had the opportunity to cross-examine the declarant.

Unless Mr. Saint testifies, there is a Confrontation Clause problem with admitting his statements against Mr. Smith. That, standing alone, is sufficient reason to sever the trial. <u>See</u> <u>Zafiro v. United States</u>, 506 U.S. 534, 539 (1993) (noting that admission of inadmissible evidence against a codefendant compromises a specific trial right of a defendant and is cause to sever the trial). Relatedly, if Mr. Saint does not testify, any statements he made that are incriminating of Mr. Smith must be excluded pursuant to the Supreme Court's holding in <u>Bruton</u>. <u>See also</u> <u>Lilly</u>, 527 U.S. at 131 ("we have over the years spoken with one voice in declaring presumptively unreliable accomplices' confessions that incriminate defendants").

Rule 14 of the Federal Rules of Criminal Procedure requires severance or other relief whenever a defendant may be prejudiced by joinder of defendants in an indictment or by joinder for trial altogether. <u>See</u> <u>United States v. Escalante</u>, 637 F.2d 1197, 1201 (9th Cir. 1980); <u>United States v. Lutz</u>, 621 F.2d 940, 945 (9th Cir. 1980); <u>United States v. Tousant</u>, 619 F.2d 810, 813 (9th Cir. 1980). A decision to sever

1   multiple co-defendants' cases remains within the trial court's discretion. See United States v. Doe, 655 F.2d

2   920, 926 (9th Cir. 1981); United States v. Seifert, 648 F.2d 557, 563 (9th Cir. 1980). To warrant the

3   issuance of a severance, the defendant must demonstrate that a joint trial is "so manifestly prejudicial that

4   it outweighs the dominant concern with judicial economy and compels the exercise of the court's discretion

5   to sever." Doe, 655 F.2d at 926 (citations omitted). See also Zafiro, 506 U.S. at 539. A joint trial would

6   greatly prejudice Mr. Smith for several reasons.

7        First, without severance, the jury may find Mr. Smith guilty by association, impinging on his due

8   process rights. It is important to note that "[n]either mere association and activity with a co-conspirator nor

9   even knowledge of the conspiracy's existence . . . meets the standards [required] to link a defendant to the

10  conspiracy charge." United States v. Peterson, 549 F.2d 654, 658 (9th Cir. 1977). "Mere association and

11  activity with a co-conspirator does not meet the test." United States v. Basurto, 497 F.2d 781, 793 (9th Cir.

12  1974) (citation omitted). A jury ordinarily experiences great difficulty in following admonishing

13  instructions and in keeping separate evidence that is relevant only to co-defendants. In most cases,

14       [a] co-defendant in a conspiracy trial occupies an uneasy seat. There generally will be
         evidence of wrongdoing by somebody. It is difficult for the individual to make his own case
15       stand on its own merits in the minds of jurors who are ready to believe that birds of a feather
         are flocked together.
16

17  Krulewitch v. United States, 336 U.S. 440, 454 (1949) (Jackson, J., Concurring). If a jury cannot

18  compartmentalize the evidence that pertains to each defendant, the trial court runs the risk of allowing a

19  conviction based upon a defendant's association with incriminating evidence alone. In this case, Mr. Smith

20  runs the risk of conviction based upon Mr. Saint's alleged statements regarding his agreement with the

21  undercover agent and alleged alien to transport them in exchange for a fee, not to mention allegations that

22  Mr. Saint bragged to co-workers about his prior alien smuggling activity which could be admissible under

23  FED. R. EVID. 404(b) if the government can satisfy its burden to admissibility.

24       The jury cannot reasonably be expected to compartmentalize the evidence as it relates to Mr. Smith

25  alone. Cf. United States v. DeRosa, 670 F.2d 889, 898-99 (9th Cir. 1982) (noting that highly limited

26  implicit connections between co-defendants may allow the jury to "easily compartmentalize the evidence").

27  Since Mr. Smith will likely be prejudiced by evidence admissible only against his co-defendant, his rights

28  can only be protected by severance from him.

Second, the Court should also sever because the defendants may end up with antagonistic defenses. Mr. Smith may claim at trial that he never intended to assist the alleged alien without anything and never intended for Mr. Saint to succeed in his alien smuggling venture, but was merely driving himself to his office and essentially stands in the shoes of a material witness. "Mutually exclusive defenses are said to exist when acquittal of one codefendant would necessarily call for the conviction of the other." United States v. Tootick, 952 F.2d 1078, 1081 (9th Cir. 1991). In Tootick, the Ninth Circuit noted that many facets of antagonistic defenses create unacceptable prejudice towards co-defendants, including: (1) defense counsel become essentially a second prosecutor, although defense counsel are not bound by the same limitations as prosecutors; (2) perverse incentives are created that may affect a defendant's decision to testify, positions on evidentiary issues, etc.; and, (3) jurors may convict both defendants rather than sort out the complexities of antagonistic defenses, particularly given that it may appear that the prosecution is the only party presenting a consistent case. Id. at 1082.

The chances that the defenses will become mutually antagonistic, or at least that Mr. Smith might have an incentive to turn on Mr. Saint, are significant. Mr. Smith has very little involvement with Mr. Saint during the course of events related by the undercover agent, alleged alien, and Mr. Saint himself. The government might give a strong incentive for Mr. Smith to blame everything on Mr. Saint (i.e., argue that Mr. Saint is guilty of smuggling aliens, but that he was just riding to his office). The Court can obviate that problem, and the other problems addressed in this section, through severance.

Finally, it should be clear that Mr. Saint's statements are not usable against Mr. Smith. In Crawford, the Supreme Court overruled twenty-four years of precedent, holding that: "where testimonial evidence is at issue, . . . the Sixth Amendment demands what the common law required, unavailability and a prior opportunity for cross-examination." 541 U.S. at 68. Prior to Crawford, "hearsay-type" evidence was admissible if it fell within a "firmly rooted" hearsay exception or bore particularized guarantees of reliability. See id.; see also Ohio v. Roberts, 448 U.S. 56, 100 S. Ct. 2531 (1980).

All the post-arrest statements of Mr. Smith's codefendant are obviously testimonial. The only time statements are nontestimonial when made during police interrogation is if the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency. Davis v. Washington, 126 S.Ct.

1   2266 (2006). This is not the circumstance present in this case. Instead, the statements were aimed at

2   "proving past events potentially relevant to later criminal prosecution." Id.

3           It matters not that these statements might satisfy the Rules of Evidence; the new test is whether

4   evidence sought to be introduced is or is not "testimonial." Id. at 61, 124 S. Ct. at 1363 ("Where testimonial

5   statements are involved, we do not think the framers meant to leave the Sixth Amendment's protection to

6   the vagaries of the rules of evidence . . . ."); see also id. at 69, 124 S. Ct. at 1374 ("Where testimonial

7   statements are at issue, the only indicium of reliability sufficient to satisfy constitutional demands is the one

8   the Constitution actually prescribes: confrontation").

9           Post-Crawford, several courts have not allowed the government to rely upon the rationale that certain

10  statements were not offered for the truth or were only offered show context or the effect on the listener

11  because "[u]nder the prosecution's theory, every time a person says to the police 'X committed the crime,'

12  the statement (including all corroborating details) would be admissible to show why the police investigated

13  X. That would eviscerate the constitutional right to confront and cross-examine one's accusers." United

14  States v. Silva, 380 F.3d 1018, 1020 (7th Cir. 2004) (reversing where district court admitted officer's

15  testimony about confidential informant's statements even though government offered evidence not for the

16  truth but to show why certain actions were taken). In United States v. Nielsen, 371 F.3d 574 (9th Cir. 2004),

17  the Court reversed a conviction where the trial court admitted a government agent's testimony about the

18  statements of the defendant's girlfriend – made in response to police questioning – although the government

19  claimed they were offered not for their truth but to show why the agents took the actions they did. Also,

20  in United States v. Cromer, 389 F.3d 662, 674 (6th Cir. 2004), that court did not allow admission of

21  testimony from officer's about confidential informants' statements about and descriptions of the defendant

22  and his nickname "Nut" because it "explicitly, albeit not directly, informed the jury that someone had

23  implicated Nut in illegal activity." Id.

24          No testimonial statement is exempted from the categorical rule of the Confrontation Clause simply

25  because they may be admitted to show "context," "effect on the listener" or to provide the "ebb and flow"

26  of the conversation; to do allow that kind of evidence would eviscerate the Confrontation Clause. See Silva,

27  380 F.3d at 1020. Allowing that evidence would run counter to Crawford's goal of replacing court-created

28  exceptions with categorical constitutional guarantees. See Crawford, 541 U.S. at 67-68 ("By replacing

1  categorical constitutional guarantees with open-ended balancing tests, we do violence to their design.

2  Vague standards are manipulable, and, while that might be a small concern in run-of-the-mill assault

3  prosecutions like this one, the Framers had an eye toward politically charged cases . . .where the impartiality

4  of even those at the highest levels of the judiciary might not be so clear.").

5      This Court, accordingly, should enter an order prohibiting the prosecution from introducing this

6  evidence unless it can also provide the declarant who made the statements.

7  ## VI.

8  ## MOTION FOR LEAVE TO FILE ADDITIONAL MOTIONS

9      Defense counsel requests leave to file further motions and notices of defense based upon information

10  gained in the discovery process as well as defense investigation.  In particular, Mr. Smith intends to file,

11  at the least, motions to suppress statements.

12  ## VII.

13  ## CONCLUSION

14      For these and all the foregoing reasons, the defendant, Mr. Smith, respectfully requests that this

15  Court grant his motions and grant any and all other relief deemed proper and fair.

16      Respectfully submitted,

17

18  DATED: August 29, 2008
        _s/ Jason I. Ser_____

19      JASON I. SER
        Federal Defenders of San Diego, Inc.
        Attorneys for Mr. Smith

20      E-mail:  jason_ser@fd.org

21

22

23

24

25

26

27

28

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) ) | |
| Plaintiff, | ) ) | Case No. 08CR1969-JM |
| v. | ) ) | |
| MANLEY LAMONT SMITH, | ) ) | CERTIFICATE OF SERVICE |
| Defendant. | ) ) | |
| | ) | |

        Counsel for Defendant certifies that the foregoing pleading, is true and accurate to the best of his information and belief, and that a copy of the Defendant's Notice of Motions and Motions has been electronically served this day upon:

        Mark Conover
        Assistant U.S. Attorney
        880 Front Street
        San Diego, CA  92101

Dated:  August 29, 2008                 ___*/s/  Jason  I.  Ser*___
                                    JASON I. SER
                                    Federal Defenders
                                    225 Broadway, Suite 900
                                    San Diego, CA 92101-5030
                                    (619) 234-8467  (tel)
                                    (619) 687-2666  (fax)
                                    jason_ser@fd.org