1  KAREN P. HEWITT
   United States Attorney
2  W. MARK CONOVER
   Assistant U.S. Attorney
3  California State Bar No. 236090
   United States Attorney's Office
4  880 Front Street, Room 6293
   San Diego, California 92101-8893
5  Telephone: (619) 557-5200/(619) 235-2757 (Fax)
   Email: mark.conover@usdoj.gov
6
7  Attorneys for Plaintiff
   United States of America
8
                    UNITED STATES DISTRICT COURT
9
                   SOUTHERN DISTRICT OF CALIFORNIA
10
11  UNITED STATES OF AMERICA,        )  Criminal Case No. 08CR1969-JM
                                     )
12              Plaintiff,           )  DATE:  September 12, 2008
                                     )  TIME:   1:30 p.m.
13         v.                        )  Before Honorable Jeffery T. Miller
                                     )
14  MANLEY SMITH (2),                )  UNITED STATES' RESPONSE TO
                                     )  DEFENDANT'S MOTIONS TO:
15              Defendant(s).        )
                                     )  (1)  DISMISS    INDICTMENT   FOR
16                                   )       FAILURE   TO   PRESENT
                                     )       EXCULPATORY EVIDENCE TO
17                                   )       THE GRAND JURY AND ORDER
                                     )       DISCLOSURE OF GRAND JURY
18                                   )       TRANSCRIPTS;
                                     )  (2)  SUPPRESS STATEMENTS;
19                                   )  (3)  SUPPRESS  EVIDENCE
                                     )       OBTAINED IN VIOLATION OF
20                                   )       THE FOURTH AMENDMENT;
                                     )  (4)  SEVER DEFENDANTS; AND
21                                   )  (5)  GRANT   LEAVE   TO   FILE
                                     )       FURTHER MOTIONS
22                                   )
                                     )  TOGETHER WITH STATEMENT OF
23  _____ )  FACTS AND MEMORANDUM
                                     )  OF POINTS AND AUTHORITIES
24
25  //
26  //
27  //
28  //

1       COMES NOW the plaintiff, UNITED STATES OF AMERICA, by and through its

2 counsel, Karen P. Hewitt, United States Attorney, and W. Mark Conover, Assistant U.S. Attorney,

3 and hereby files its Response to Defendant's Motions in the above-referenced case. Said Response

4 is based upon the files and records of this case together with the attached statement of facts and

5 memorandum of points and authorities.

6       DATED: September 9, 2008.

7                         Respectfully submitted,

8                         KAREN P. HEWITT
                        United States Attorney

9

10                         s/ W. Mark Conover
                        W. MARK CONOVER

11                         Assistant United States Attorney

KAREN P. HEWITT
United States Attorney
W. MARK CONOVER
Assistant U.S. Attorney
California State Bar No. 236090
United States Attorney's Office
880 Front Street, Room 6293
San Diego, California 92101-8893
Telephone: (619) 557-5200/(619) 235-2757 (Fax)
Email: mark.conover@usdoj.gov

Attorneys for Plaintiff
United States of America

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>        Plaintiff,<br><br>    v.<br><br>MANLEY SMITH (2),<br><br>        Defendant(s). | Criminal Case No. 08CR1969-JM<br><br>DATE:  September 12, 2008<br>TIME:   1:30 p.m.<br>Before Honorable Jeffery T. Miller<br><br>UNITED STATES' STATEMENT OF FACTS AND MEMORANDUM OF POINTS AND AUTHORITIES |

**I**

**STATEMENT OF THE CASE**

On June 13, 2008, Manley Lamont Smith (hereinafter "Defendant"), was indicted by a grand jury with violating 8 U.S.C. §§ 1324 (a)(1)(A)(ii), (a)(1)(B)(I), and (v)(II), Transportation of Illegal Aliens for Financial Gain and Aiding and Abetting.  Defendant was arraigned on the Indictment on June 17, 2008, and entered a plea of not guilty.

**II**

**STATEMENT OF FACTS**

**A.    DEFENDANT'S APPREHENSION**

On the evening of May 30, 2008, Border Patrol Agents met with three Wackenhut Corporation employees, including Transportation Officer ("T.O.") Vincent Reyes.  T.O. Reyes

provided a four-page, typed and signed document outlining his observations of the actions of Wackenhut Sergeant Christopher SAINT-Lucero ("SAINT") that day. This document identified what T.O. Reyes believed was an alien smuggling event. In brief, the document and subsequent verbal account of T.O. Reyes stated the following:

T.O. Reyes reported that he and Sgt. SAINT were scheduled to work together. During the course of this shift they responded to several Border Patrol Stations and picked up aliens processed for voluntary returns to Mexico. They were operating their assigned marked Wackenhut MCI bus. T.O. Reyes was driving. T.O. Reyes and Sgt. SAINT transported the aliens to the San Ysidro Port of Entry and presented them to the Mexican immigration officers. One of the aliens, identified as Vidal Orellana-Cabrera ("Orellana"), (DOB 01/01/1964, FINS# 1075340875), was not allowed into Mexico because the Mexican immigration officers identified him as possibly being a Guatemalan citizen.

The Mexican immigration officer wrote "Guatem" alongside the alien's name on the I-216 form (The I-216 Record of Departure form is used to document the departure of Mexican nationals to Mexico. The departure is physically verified by Mexican immigration officials at the Ports of Departure and the forms are stamped by the Mexican officials and are to be returned to the Border Patrol Station from which the Mexican nationals were apprehended.), sheet number 9265568. T.O. Reyes wrote "kick back" on the form alongside the alien's name. Sgt. SAINT directed T.O. Reyes to cross out "Guatem" and "kick back" from the I-216. T.O. Reyes then heard Sgt. SAINT say the following to Orellana; "How much money do you have?" "Do you have money or can you get money?" "Is it Los Angeles that you're going?" "Can you get money them (sic)?" "This will cost you about $2,000.00 dollars." Orellana responded to Sgt. SAINT that he could get the money from Los Angeles.

T.O. Reyes then observed Sgt. SAINT place a call on his Nextel and heard him say, "It's what we talked about, and I have one. He can get the money in Los Angeles." T.O. Reyes said that upon receiving a "kick-back" from the San Ysidro Port of Departure their normal route of

4

1    travel would be to go to the Chula Vista Station via Beyer Boulevard whereupon the returned alien

2    is taken back to the Chula Vista processing center and turned back over to the Border Patrol.

3          After this exchange, Sgt. SAINT instructed T.O. Reyes to drive to the east side of the San

4    Ysidro Port of Entry and stop behind a section of buildings which was out of view of the port.

5    This required that T.O Reyes turn south onto East San Ysidro Boulevard from Camino De La Plaza

6    where it turns north onto East Beyer Boulevard. Sgt. SAINT told T.O. Reyes to stop, whereupon

7    Sgt. SAINT escorted Orellana off the bus telling him to proceed to the corner and wait. Sgt.

8    SAINT directed T.O. Reyes to proceed around the block, circling the Grey Hound complex and

9    upon nearing the corner where Orellana was standing, Sgt. SAINT told him to stop again. Sgt.

10    SAINT got off the bus and approached Orellana. After a few minutes Sgt. SAINT returned to the

11    bus, but upon seeing Orellana still standing at the corner, Sgt. SAINT said, "I told him to go to the

12    flag poles". T.O. Reyes and Sgt. SAINT departed in the bus and as they passed the

13    Jack-in-the-Box Restaurant, located at 721 East San Ysidro Boulevard, he observed Orellana

14    walking towards the flag poles at the southwest corner of the restaurant. Sgt. SAINT then made

15    contact with an unidentified subject via Nextel and informed him as to the location of Orellana.

16    As T.O. Reyes drove the bus, Sgt. SAINT explained that he had this all worked out and would

17    explain it to him. Sgt. SAINT suggested that T.O. Reyes obtain a Nextel radio. Sgt. SAINT

18    explained that when T.O. Reyes got "kick-backs" from the port to call him and he could transport

19    them in the (Wackenhut) Jeep and it would not be questioned. Sgt. SAINT went on to tell T.O.

20    Reyes that he had done this about ten times already.

21          Agents assigned to the San Diego Sector Smuggling Interdiction Group (SIG) responded

22    to this report by preparing to observe the alleged smuggling activity. On Sunday June 1, 2008, SIG

23    Agent Ortiz was placed undercover in a holding cell at the Chula Vista  Border Patrol Station in

24    Chula Vista, California along with William Romero-Estrada, an undocumented alien from El

25    Salvador. Agent Ortiz was in plain clothes and assumed the name Alberto Rodroguez-Osegueda

26    and the date of birth 09/28/1973. He was listed as a citizen of Mexico and was presented as

27

28                                                  5

1    processed for voluntary return to Mexico.  Agent Ortiz and Romero were entered onto Bureau form

2    I-216 Record of Departure along with five other Mexican nationals processed for voluntary returns

3    under event number CHU0806000009.

4           At about 11:00 a.m., Wackenhut Sgt. SAINT arrived  to transport Mexican nationals

5    housed at the Chula Vista Border Patrol Station who were processed as voluntary returns to

6    Mexico.  Agent Ortiz and ROMERO were loaded into the bus and transported to the San Ysidro

7    Port for Departure to Mexico.  SIG Agents, all in plainclothes and operating unmarked DHS

8    vehicles, conducted surveillance of the Wackenhut bus.  The driver of the marked Wackenhut MCI

9    bus, numbered 2049, was identified as to Otha Hayes.  Sgt. SAINT was his assigned partner for

10   this shift.

11          At the  San Ysidro Port of Departure, all passengers were off-loaded and presented to the

12   Mexican immigration officers for interview before being allowed to proceed into Mexico.  Agent

13   Ortiz was interviewed in turn by Mexican Immigration Officers.  Agent Ortiz was questioned as

14   to his citizenship.  Agent Ortiz said he was from the State of Chiapas.  When questioned as to

15   where in Chiapas, Agent Ortiz said Santa Ana.  The officer asked again where, to which Agent

16   Ortiz again replied Santa Ana.  The officer asked Agent Ortiz how old he was, Agent Ortiz said

17   thirty-three years old.  The officer asked Agent Ortiz what year he was born to which he replied

18   1970, in conflict to the information printed on the presented Form I-216.  This alerted the officer

19   as it was not consistent with the information on the Form I-216, and Agent Ortiz was referred to

20   another Mexican immigration officer for further questioning.  When asked where he was from,

21   Agent Ortiz said he was from El Salvador.

22          The Mexican immigration officer informed T.O. Hayes that Agent Ortiz was from El

23   Salvador.  T.O. Hayes yelled to Sgt. SAINT, who was several feet away, "This guy is an OTM."

24   ("OTM" means "Other than Mexican").  Agent Ortiz was placed aside until the rest of the Mexican

25   nationals could be interviewed.  Romero approached the Mexican immigration officer at the

26   voluntary return gate and was asked where he was from.  Romero said he was from Chiapas as

27

28                                          6

well. The officer asked where in Chiapas to which Romero replied Santa Ana. The officer immediately referred Romero to the assisting immigration officer for further questioning. Romero admitted to the officer that he was also from El Salvador. Romero was placed alongside Agent Ortiz until such time that the rest of the individuals could be interviewed. The remaining occupants on the bus were accepted as voluntary returns and allowed to proceed into Mexico.

With a set of handcuffs in his hand, Sgt. SAINT approached Agent Ortiz and Romero. Agent Ortiz asked Sgt. SAINT in the Spanish language to give them a break to which he replied in the Spanish language, "Give you a break?" "Do you have any money?" Sgt. SAINT then placed handcuffs on Agent Ortiz and Romero and escorted them into the bus. T.O. Hayes remained with the rest of the group being voluntarily returned to Mexico. Once back on the bus, Sgt. SAINT asked Agent Ortiz and Romero where they were going to. Agent Ortiz and Romero said they were going to Los Angeles. Sgt. SAINT asked if they had money. Agent Ortiz said he didn't have any on him. Romero said he was going to originally pay $3,000.00 dollars to be smuggled. Agent Ortiz then said he could pay $1,000.00 dollars. Sgt. SAINT said O.K., let me make a call. Sgt. SAINT then instructed Agent Ortiz and Romero not to say anything else until later. Agent Ortiz observed Sgt. SAINT use his telephone to alert someone with what Agent Ortiz believed to be a Nextel phone.

As T.O. Hayes entered the bus to depart the area, Sgt. SAINT told him that he would take care of them (the kick-backs). While en route to the Chula Vista Station Sgt. SAINT told T.O. Hayes that he would take Agent Ortiz and Romero to the (Chula Vista) station in the Jeep. T.O. Hayes asked Sgt. SAINT why, since they were already going to the Chula Vista Station in the bus. Sgt. SAINT replied: "Just do, don't ask!" They proceeded to the Chula Vista Border Patrol compound but did not return to the processing building, rather stopping at the gasoline pumps on the far southern side of the compound.

As the Wackenhut bus was entering the Chula Vista Station compound via the Beyer Boulevard gate a marked Wackenhut Jeep Liberty, bearing California license plate 5WRM280,

7

was departing the compound.  Sgt. SAINT jumped out of his seat abruptly and told T.O. Hayes to stop the bus.  Sgt. SAINT got out, went to the driver of the Jeep, spoke to him briefly and walked back to the bus.  The driver of the Jeep, identified as T.O. Manley Lamont SMITH drove the Jeep alongside the rear of the Wackenhut bus.

Sgt. SAINT then instructed T.O. Hayes to take a lunch break.  Once T.O. Hayes departed, Sgt. SAINT directed Agent Ortiz and Romero to get off of the bus.  Once out of the bus, Sgt. SAINT told Agent Ortiz and Romero to get in the Wackenhut Jeep.  Agent Ortiz heard Sgt. SAINT say to T.O. SMITH in the English language, "$5,000.00 bucks!"  T.O. SMITH then said in the English language to Sgt. SAINT, "$5,000.00!" in an excited tone of voice.  T.O. SMITH told Sgt. SAINT, "I have my car here, I can take them or I can stash them until later."  Sgt. SAINT told T.O. SMITH, "Let's see, let's go to your car."  Sgt. SAINT then told T.O. SMITH, "I'll drop them off, call me later."  T.O. SMITH drove the Wackenhut Jeep to his car, a black Jaguar bearing California license plate 5ZDJ068, and exited the Jeep.  Sgt. SAINT got in the driver's seat of the Wackenhut Jeep and drove off, departing the Chula Vista compound with Agent Ortiz and Romero handcuffed in the back seat.

Once in the Jeep, in the Spanish language Sgt. SAINT informed Agent Ortiz and Romero that he would take them to a park near the Border Patrol Station and make arrangements to pick them up.  Sgt. SAINT said he was the law, the authority and to do as he says.  Sgt. SAINT said not to worry because he was the law.  Sgt. SAINT said to Agent Ortiz and Romero they would not get caught and they would make it to Los Angles, he would see to it.  Sgt. SAINT said once in Los Angeles they would call their families to make the payment arrangements.  Sgt. SAINT said to wait at the park and not to leave or speak to anyone.  Sgt. SAINT said to Agent Ortiz and Romero not to walk around because there were a lot of Border Patrol Agents around.  Sgt. SAINT said if they left the park, he would find them and they would pay for it.

Sgt. SAINT proceeded to transport Agent Ortiz and Romero to the Howard Lane Neighborhood Park located on the northwest corner of the intersection of Dairy Mart Road and

8

1    Beyer Boulevard.  Agent Ortiz observed Sgt. SAINT drive around the block.  After doing so, Sgt.

2    SAINT again instructed Agent Ortiz and Romero to remain at the park or they would pay for it.

3    Sgt. SAINT handed Romero a handcuff key and told them to take the cuffs off.  At approximately

4    12:00 noon, Sgt. SAINT pulled up along the curbside on Dairy Mart Road and instructed Agent

5    Ortiz and Romero to get out and walk to the area where they were to wait.

6         Approximately an hour later, at about 1:20 p.m., Border Patrol Agents conducting

7    surveillance observed a black Toyota Tundra pickup bearing California license plate 8J45800, with

8    Sgt. SAINT behind the wheel.  Sgt. SAINT parked at the southwest corner of the park, lowered

9    his passenger side rear window and motioned with his hand to Agent Ortiz and Romero to come

10   to the truck.  Agent Ortiz and Romero slowly approached the vehicle afoot.  Agent Hansen advised

11   all units in the area to slowly approach the Toyota.  Agent Ortiz opened the rear door of the truck

12   and Romero entered the Toyota sitting in the rear seat.  Agent Ortiz opened the passenger's side

13   front door.  Agent Ortiz observed that Sgt. SAINT was still in full duty uniform with badge and

14   duty holster including his service issued firearm.  Agent Ortiz identified himself as a federal agent

15   and ordered Sgt. SAINT to raise his hands and not to move.  Sgt. SAINT complied.  Numerous

16   Border Patrol Agents then converged on the Toyota.  Agent Ortiz placed Sgt. SAINT under arrest

17   for suspicion of alien smuggling.  Sgt. SAINT, the black Toyota Tundra and Romero were taken

18   to the Chula Vista Border Patrol Station for processing.  Sgt. SAINT was in possession of three

19   cellular telephones, all of which were seized as evidence.  SAINT's duty belt and weapon were

20   seized.  His weapon was a .40 caliber Smith and Wesson semi-automatic, fully loaded with a

21   10-round magazine and one round in the chamber.  SAINT's duty belt contained two additional

22   fully loaded 10-round magazines.  The ammunition was S&W .40 caliber hollow point.

23         At about 1:45 p.m., Agents Ortiz, Rodriguez, Hansen and Harkenrider walked into to the

24   Wackenhut office, on the Chula Vista Border Patrol compound.  Agents observed T.O. SMITH

25   sitting at a desk near the doorway.  T.O. SMITH was in full duty uniform with his service issued

26   firearm on his person.  Agents placed T.O. SMITH under arrest for suspicion of alien smuggling.

27

28                                              9

Agents walked T.O. SMITH to the Chula Vista Border Patrol Station for processing.    While walking, without having been asked any questions, T.O. SMITH stated, "Oh, I know what this is about, I know now."  SMITH was in possession of five cellular telephones, all of which were seized as evidence.  SMITH's duty belt and weapon were seized.  His weapon was a .40 caliber Smith and Wesson semi-automatic, fully loaded with a 10-round magazine and one round in the chamber.

Agent Hansen met with Wackenhut Lt. Cabusora in the late afternoon of June 1, 2008, and seized the I-216 from today's event as well as the I-216 from Friday's event (5/30/08).  The I-216 regarding today's event indicated that both Agent Ortiz and Romero had been voluntarily returned to Mexico.  There was no indication that they had been denied entry into Mexico.

### B.    POST-MIRANDA STATEMENT OF CRISTOPHER SAINT-LUCERO

At 7:24 p.m. on June 1, 2008, SAINT provided SIG Agent Andrew Kahl with a videotaped post-Miranda statement in the English language, which is summarized as follows:

SPA Kahl read SAINT his Miranda rights in the English language and asked if he had understood those rights.  SAINT said that he understood his rights, and that he was willing to answer questions without the presence of an attorney.  When asked about his employment, SAINT stated that he is employed as the swing shift supervisor and Sergeant of Transportation Officers for Wackenhut, and in which capacity he serves as a contract Transportation Officer (T.O.) for the Border Patrol. When asked to explain how he had become involved in the smuggling of undocumented aliens, SAINT stated that he and a Wackenhut co-worker of his, whom he identified as Manley SMITH, had lived in Tijuana together as roommates and had rented a large house in Calle Cucapah, from a subject known as "Ernesto" and his wife, whose name he believed was Claudia MEDINA.

SAINT stated that he had explained to "Ernesto" that he worked as a T.O. for Wackenhut and that he moved detainees for the Border Patrol.  "Ernesto" told him that smuggled aliens were worth a lot of money.  He told SAINT that if he ever had any undocumented aliens available, that

10

he could take them off his hands and that there was good money in it.  "Ernesto" stated that he had somebody who would take and smuggle the undocumented aliens.  "Ernesto" told SAINT that he would give him half of whatever he earned per alien.  SAINT stated that he interpreted this to mean that he personally would get about $1,000.00 (USD), but said that the exact amount was never specified.  "Ernesto" told SAINT to call him if he ever has an alien to hand over and that he could come and pick the subject up.

SAINT stated that the first time that he decided to pursue "Ernesto's" offer was last Saturday, May 30, 2008, when SAINT was working together with another T.O. named REYES.  SAINT stated that the only other time that he had ever attempted to smuggle any detainees was today, June 1, 2008.

SAINT stated that T.O. Hayes told him that two of the detainees had turned out to be OTMs from Guatemala.  He said that the two aliens were separated and that they handcuffed them and placed them back on the bus.  SAINT asked them where they were going to be smuggled to, and the two of them said that they were being smuggled to Los Angeles.  He asked if they had someone waiting for them, and they stated that they did.  He asked them how much they were to have paid, and one of the aliens stated that he had been tricked by a smuggler who had taken his money.  The other alien stated that he had access to $1,500.00 (USD).  SAINT told them that he knew a guy who could take them north and that it was a sure thing and that the guy was honest and wouldn't trick them.  He asked if they wanted him to contact this guy and they told him, "Yes."

SAINT stated that he told T.O. Hayes that they were going back to Chula Vista Station.  He stated that it was his intention to hand these two aliens  over to "Ernesto" in exchange for half of whatever the smuggling fee would have been.  Upon arriving at Chula Vista Station, SAINT stated that he told T.O. Hayes that he could go ahead and break for lunch, and that he would take care of dropping off the aliens at Chula Vista.  He stated that T.O. Hayes then got in his personal vehicle and drove away.

1    SAINT said that as this was happening he saw T.O. SMITH arriving in the van, parking

2    it and getting the marked Wackenhut Jeep. He stated that he flagged T.O. SMITH down and said

3    that he had two OTMs. He stated that he had previously mentioned to T.O. SMITH that "Ernesto"

4    their prior landlord, had offered to take aliens off his hands for a percentage of the smuggling fee.

5    SAINT stated that T.O. SMITH appeared to already realize that he didn't really plan on bringing

6    the aliens back to Chula Vista Station. He then stated to T.O. SMITH that he had made a deal with

7    the aliens and that he was trying to hand them over to "Ernesto" but that "Ernesto" wasn't

8    answering his phone. He then stated to T.O. SMITH that OTMs were worth a lot of money, about

9    $2,500.00 (USD) each, which would total $5,000.00, implying that the two of them could share

10   whatever the profit was. SAINT stated that T.O. SMITH was obviously interested and stated "OK"

11   and offered to use his personal car, a black Jaguar S-Type. When SAINT told him that he was

12   going to use the Jeep, T.O. SMITH asked him if he wanted him to follow in his Jaguar. He told

13   T.O. SMITH that he didn't think that it would be necessary, but that he would call him if he needed

14   anything like that. SAINT stated that he hadn't even been able to reach "Ernesto" and that there

15   wasn't much point in him driving the aliens around if he couldn't get in touch with him. He then

16   told T.O. SMITH that he was going to do a few laps around the block in the Jeep and see if he

17   could get in touch with "Ernesto" and that if that failed, he would just return the aliens to Chula

18   Vista Station. T.O. SMITH stated to him "OK" and told SAINT to give him a call if he needed

19   him to come in his car.

20        SAINT stated that he pulled out of Chula Vista Station after driving a short distance he had

21   still not heard from "Ernesto" and so he explained to the two aliens that he couldn't reach his guy,

22   and then proposed that he drop them off at the park, telling them to stay in that exact spot, so that

23   the guy could find them, pick them up and take them north. He told them not to walk around or

24   go anywhere, since it was close to the Border Patrol Station and it was likely that they would be

25   arrested. SAINT returned to pick up the aliens and pulled up to the park in his Tundra and

26

27

28                                         12

1    motioned for the two Aliens to get in his truck.  As they loaded into the vehicle a bunch of agents

2    came up and arrested him.

3        SAINT was asked by Agent Kahl for permission to access and search the memory of his

4    Motorola i880 Boost phone, and he granted SPA Kahl consent to search the memory of his phone.

5        **C.**    **POST-MIRANDA STATEMENT OF MANLEY LAMONT SMITH**

6        At 5:47 p.m. on June 1, 2008, SMITH provided SIG Agent Andrew Kahl with a videotaped

7    post-Miranda statement in the English language, which is summarized as follows:

8        SPA Kahl read SMITH his Miranda rights in the English language and asked if he had

9    understood those rights.  SMITH said that he understood his rights, and that he was willing to

10   answer questions without the presence of an attorney.  SMITH stated that he understood why he

11   had been placed under arrest.

12       SMITH stated that he is a United States citizen and that he was born in York, Pennsylvania

13   on 08/23/69.  He currently lives in National City, California.  He said he used to live with SAINT,

14   but SAINT had cheated him out of some money.  When asked where they had rented, SMITH

15   started to respond, stammered and indicated that he wanted to leave it at that.  When asked about

16   his employment, SMITH stated that he is employed as a day shift supervisor for Wackenhut, and

17   in which capacity he serves as a contract Transportation Officer (T.O.) for the Border Patrol.  He

18   used to be a private security officer.  SMITH stated that he has worked for Wackenhut since the

19   contract began in December of 2006.  SMITH said he has a current "guard card" and firearms

20   permit.  SMITH said he worked graveyard shift, and now days.  SMITH said he and SAINT have

21   been employed together at Wackenhut since the contract began.  SMITH stated that he has an

22   application in as a police officer for Los Angeles International Airport (L.A.X.) Police Department

23   and that he had just been accepted.

24       On today's date, SMITH said he did a juvenile run, where he transports juvenile aliens from

25   the San Ysidro Port Enforcement Team to the VR gate, accompanied by a Mexican Consular

26   Official.  At about 11:00 a.m. he had just dropped off the consular officer and was returning his

27

28                   13

assigned Wackenhut van when Sgt. SAINT called him stating he needed the van to transport aliens from Chula Vista. He was told there were ten more people than would fit in the bus. SMITH said he suggested that they have the next shift do it, but SAINT said they should do it all now. SMITH said he was in a Jeep at the time, having dropped the van off at the compound, so he returned and got back into the van. After loading the ten people into the van, he followed the bus to the POE and unloaded his people with those from the bus.

SMITH then went to get his I-216 for the juvenile run, which the Mexican consulate had kept. SAINT asked SMITH what else he needed to do today and SAINT told him to do his trip logs and go home. SMITH said his shift didn't end until 2:00 p.m., SMITH said he said thanks, but then remembered about the Lieutenant and realized he could not go home, because he calls them constantly and checks up on them. SMITH went to the pumps (Chula Vista Station compound) and dropped off the van and was getting into the Jeep when he saw SAINT and Hayes had arrived in the bus.

SAINT waved him down and said that he had two prisoners. SMITH asked him if they were OTMs. SAINT said that they were, and then took two people off the bus in handcuffs and put them in the Jeep. SMITH said he asked SAINT if he was taking them down to Chula Vista Station, and SAINT said "No, they offered me $5,000.00 apiece" SMITH said he replied, "Oh really, yeah right," because SAINT is always joking like that. SAINT again said that they offered $5,000.00 apiece, and SMITH said he replied, "Oh, OK, I got my car here," jokingly. SAINT then asked SMITH if he remembered Claudia and her husband, he responded that he did. When asked about his interpretation of SAINT's statement that the aliens had offered him $5000.00, he stated that the only thing which occurred to him was that the aliens had offered SAINT $5000.00 to let them go, but that he didn't take it seriously.

SMITH said he thought that Hayes was still on the bus. While driving to the barracks SMITH said that SAINT said something which he did not hear. SAINT asked him which car he had, to which SMITH said, "My Jaguar". SMITH explained that he owns a black 2003 Jaguar

S-type.  SMITH stated that he could not remember what SAINT's response had been to his statement that he had his Jaguar.  At the barracks SMITH then got out of the Jeep and SAINT drove off around the corner.  SMITH stated that at no time did he believe that SAINT was really going to let the aliens go and that he had not taken him seriously.  He stated that at no time did he actually offer to go get the Jaguar nor did he offer SAINT the use of his Jaguar.  He said that SAINT did not ask to be allowed to use it either.  He stated that he did not offer to help SAINT or agree to participate in setting the aliens free or smuggling them.  SMITH stated that he fully believed that SAINT was going to drive around the corner and drop off the aliens at the Chula Vista processing center.  He characterized his exchange with SAINT as him making a flippant remark to SAINT in a joking fashion, and nothing more.

When asked whether it was common practice to transport detainees around in the uncaged Wackenhut Jeep, SMITH stated that this was commonly done.  When asked if it was normal to change the "kicked-back" detainees from one vehicle to another, instead of driving them straight back to the Chula Vista processing center, SAINT stated that this was also commonly done. SMITH said that, upon entering the office, he then called a female friend, whom he identified as Andrea Martinez, and told her what his Sergeant had said to him.    SMITH said that the Sergeant had told him these guys had offered him $5,000.00.  He told her that SAINT is always joking but that he seemed to have a serious tone in his voice this time.  She told him that it wasn't worth anybody's job.  He said "Yeah, but $5,000.00, that's just hilarious."  She said she hoped he wasn't thinking about doing it.  He said he was not, "but $5,000.00 will get you, we're always talking about, a motorcycle. I'm just selling my car for $3,000.00 and they offer $5,000.00 to do that", but he agreed that he wouldn't do it.  She said that she didn't want to hear about it and asked him why he was telling her about this.  SMITH said he answered that she was always saying that they never communicated, and that was why he was telling her.

SMITH said that SAINT returned and stated that he had not answered his phone.  SMITH said he left his phone on the desk, and that it was on vibrate.  SMITH asked whether SAINT had

15

dropped the aliens off at Chula Vista Station, to which SAINT said that he had. SMITH said he understood how someone observing his actions and his conversation with SAINT could conclude that he was a willing participant in the smuggling event and that he was "in on it." When asked if he believed that SAINT had committed a crime by suborning him and offering him money to help let the aliens go, SMITH stated that he didn't think so, and that he had simply thought that it was a joke and hadn't taken it seriously.

When asked about the I-216 manifest which pertained to the two aliens SAINT had left with, SMITH said that he didn't know if one had been submitted or what the actual I-216 did in fact reflect regarding those two aliens, and that it would have been Sgt. SAINT's responsibility to submit that paperwork.

Agent Kahl asked SMITH for consent to access and search the memory of his cell phone, and SMITH granted him consent.

**C.     STATEMENT OF MATERIAL WITNESS WILLIAM ROMERO-ESTRADA**

At 4:09 p.m. on 06/02/08 material witness William Edgardo Romero-Estrada provided Agent Kahl with a videotaped sworn statement in the Spanish language, which is summarized as follows:

Romero stated that he was born in Santa Ana, El Salvador on 10/28/70. Romero stated that he does not have nor has he ever had any immigration documents allowing him to be in or remain legally in the United States. Romero stated that he was to be smuggled to Los Angeles, California, and that he was to have been charged a $3,000.00 (USD) smuggling fee. Romero stated that he made the arrangements to be smuggled from Tijuana, B.C., Mexico. Romero stated that he was crossed through "El Hongo," near Tecate, B.C., Mexico last Thursday. He stated that he was then caught on Friday about 3:00 a.m.

After being taken to and processed at the Border Patrol Station Romero stated that he was asked by Border Patrol agents if he would do something honorable. He was asked and agreed to accompany an undercover Agent on a bus of aliens being returned to Tijuana via the Port-of-Entry

1    (in San Ysidro).  The Officer was pretending to be an undocumented alien.  Upon his arrival at the

2    POE, Romero was asked to tell the Mexican Officers that he was from Santa Ana, Chiapas so that

3    the Mexican Officers would not accept them and they would be kicked back to the (transportation)

4    Officers when it was discovered that they were not Mexican.  They were put aside by the Mexican

5    Officers until all subjects were interviewed and admitted into Mexico.  Romero said that he was

6    then handcuffed to the Agent by the Officers in gray uniforms and returned to the bus.

7           Romero stated that he was then asked by the one of the officers from the bus (described as

8    fair skinned, fat 1.8M tall with dark glasses) if he had any money.  Romero said he put his hands

9    in his pockets and the Officer immediately told him to "be discreet."  Romero stated that he was

10   asked, "Do you have someone to pay for you?"  He stated that both he and the Agent said that they

11   had someone in Los Angeles who would pay for them.  Romero didn't say anything else as they

12   were driven back to the Chula Vista station.  Romero stated that a black Officer, referring to

13   SMITH, parked the bus.  Another black Officer dressed in gray arrived.  Romero stated that he was

14   shorter than the driver.  He said they spoke in English and he did not understand them.  Romero

15   stated that the shorter Officer parked a vehicle, (with large letters on it) next to the bus. He stated

16   that it was a "small SUV".  Romero stated that they pulled the vehicle close to the bus as if to move

17   the two of them into the SUV without being seen.  Romero stated they were then driven to an

18   office, the shorter black guy got out and the "fat" white guy drove them out of the gate of the

19   station.

20          Romero stated that they went in the SUV for several blocks.  They driver spoke to them

21   again and asked, "How much will your family in L.A. pay for you".  Romero said $3,000.00, and

22   he said the Agent said $1,000.00.  He said that the driver told them, "I am the law here, don't

23   worry, nothing will happen to you, do everything I say."  He asked the officer if he could un-cuff

24   them and the officer gave them a handcuff key.  Romero said that he removed his handcuffs and

25   the Agent removed his.  The Officer took the handcuffs and threw them on the seat beside him.

26

27

28                                                17

The Officer told him that he was going to leave them in a park, not to separate or leave that spot, and not to flee because he would find them, and things would go badly if they did.

A short time later a civilian double-cab pickup truck, dark brown or red, came by and made a u-turn. The driver of the pickup motioned to them three times to wait. He was driving slowly. He went out of their view and returned after 4-5 minutes. He stopped and gestured with his hand for them to come. Romero stated that the Agent went to get into the rear, driver side of the pick-up and he entered the passenger side rear door. Romero stated the Agent then drew and pointed his weapon at the driver, who was picking them up still dressed in his gray uniform. Romero says that he helped the Agent to secure the driver. Romero said that they were surrounded by about seven Agents within two seconds.

Romero says that the driver was placed into a marked, caged sedan. After returning to the station Romero says that the Agents arrested the other officer that had moved the vehicle to the bus for them to be loaded into. Romero was shown two six photograph lineup folders: In folder "A" he identified photo #2 as the Officer that pulled the Jeep up to the bus so that they could be loaded into it without being seen. Photograph #2 in photo lineup "A" depicts defendant SMITH.
In folder "B" he identified photo #5 as the Officer that brought them to the park in the Jeep and later tried to pick them up in his pick-up truck. Photograph #5 in photo lineup labeled "B" depicts defendant SAINT.

## III

## MEMORANDUM OF POINTS AND AUTHORITIES

### A.   Speculation as to grand jury instructions or exculpatory evidence does not support dismissal of the indictment or disclosure of grand jury transcripts

Defendant speculates that the Government may not have presented exculpatory evidence to the grand jury. He extracts from this speculation the erroneous proposition that failure to present exculpatory information gives rise to a number of possible grounds for dismissal of the indictment and disclosure of grand jury transcripts. This is incorrect.

1  Federal Rule of Criminal Procedure 6(e)(2) provides that the matters occurring before the

2 grand jury must not be disclosed, except for limited exceptions set forth in Rule 6(e)(3).  Rule

3 6(e)(3)(E) allows the district court to authorize disclosure of a grand-jury matter at the request of

4 a defendant who shows that a ground may exist to dismiss the indictment because of a  matter that

5 occurred before the grand jury.  Defendant asserts that he has shown a particularized need for the

6 grand jury transcripts.  This Court should deny this motion, for Defendant has not met his burden

7 to show a particularized need to overcome the secrecy of the grand jury proceedings.

8  Regardless of the contents of the grand jury proceedings, there is no theory on which the

9 defendant can rely to achieve a dismissal of the indictment in this matter.  Therefore, the court

10 should not authorize the disclosure of grand jury transcripts in this matter under Rule 6(e)(3)(E)(ii).

11 This motion is a fishing expedition that does not meet the disclosure test set forth by the Federal

12 Rules.

13  There are very good reasons why the Federal Rules of Criminal Procedure provide for the

14 secrecy of grand jury proceedings.  The Supreme Court stated, in United States v. Procter &

15 Gamble Co., 356 U.S. 677, 681-682, n. 6 (1958), the reasons for grand jury secrecy:

16  (1) To prevent the escape of those whose indictment may be contemplated; (2) to
17 insure the utmost freedom to the grand jury in its deliberations, and to prevent
persons subject to indictment or their friends from importuning the grand jurors; (3)
to prevent subornation of perjury or tampering with the witness who may testify
18 before [the] grand jury and later appear at the trial of those indicted by it; (4) to
encourage free and untrammeled disclosures by persons who have information with
19 respect to the commission of crimes; (5) to protect innocent accused who is
exonerated from disclosure of the fact that he has been under investigation, and from
20 the expense of standing trial where there was no probability of guilt.

21  In Douglas Oil Co. v. Petrol Stops Northwest, 441 U.S. 211 (1979), the Supreme Court set

22 forth the standard for determining when the traditional secrecy of the grand jury may be broken:

24  Parties seeking grand jury transcripts under Rule 6 (e) must show that the material
they seek is needed to avoid a possible injustice in another judicial proceeding, that
the need for disclosure is greater than the need for continued secrecy, and that their
25 request is structured to cover only material so needed.  Such a showing must be made
even when the grand jury whose transcripts are sought has concluded its operations,
26 as it had in Dennis.  For in considering the effects of disclosure on grand jury
proceedings, the courts must consider not only the immediate effects upon a

particular grand jury, but also the possible effect upon the functioning of future grand juries. Persons called upon to testify will consider the likelihood that their testimony may one day be disclosed to outside parties. Fear of future retribution or social stigma may act as powerful deterrents to those who would come forward and aid the grand jury in the performance of its duties. Concern as to the future consequences of frank and full testimony is heightened where the witness is an employee of a company under investigation. Thus, the interests in grand jury secrecy, although reduced, are not eliminated merely because the grand jury has ended its activities.

441 U.S. at 222.

Any claim that the government has a judicially based obligation to disclose substantial exculpatory evidence to the grand jury is directly contradicted by United States v. Williams, 504 U.S. 36, 51-53 (1992) ("If the grand jury has no obligation to consider all 'substantial exculpatory' evidence, we do not understand how the prosecutor can be said to have a binding obligation to present it." (emphasis added)).  See also, United States v. Haynes, 216 F.3d 789, 798 (9th Cir. 2000) ("Finally, their challenge to the government's failure to introduce evidence impugning Fairbanks's credibility lacks merit because prosecutors have no obligation to disclose 'substantial exculpatory evidence' to a grand jury." (citing Williams) (emphasis added)).

In United States v. Isgro, 974 F.2d 1091 (9th Cir. 1992), the Ninth Circuit, while reviewing Williams, established that there is nothing in the Constitution which requires a prosecutor to give the person under investigation the right to present anything to the grand jury (including his or her testimony or other exculpatory evidence), and the absence of that information does not require dismissal of the indictment.  974 F.2d at 1096 ("Williams clearly rejects the idea that there exists a right to such 'fair' or 'objective' grand jury deliberations.").  Even the "obligation to disclose potentially exculpatory evidence under Brady v. Maryland, 373 U.S. 83 (1963) applies only in regard to trials." United States v. Gilbert, 198 F.3d 1293 (11th Cir. 1999).

The fact that the USAM imposes a duty on federal prosecutors to present "substantial" exculpatory evidence to the grand jury is irrelevant since by its own terms the USAM precludes defendants from reaping any benefits from the self-imposed policy.  Certain provision of the United States Attorneys' Manual ("USAM") do contain some obligation that a United Stated

1  Attorney must disclose substantial exculpatory evidence to the grand jury. Specifically, USAM

2  Section 9-11.233 reads:

3      In <u>United States v. Williams</u>, 112 S.Ct. 1735 (1992), the Supreme Court held that
   the Federal courts' supervisory powers over the grand jury did not include the

4  power to make a rule allowing the dismissal of an otherwise valid indictment where
   the prosecutor failed to introduce substantial exculpatory evidence to a grand jury.

5  It is the policy of the Department of Justice, however, that when a prosecutor
   conducting a grand jury inquiry is personally aware of <u>substantial evidence that</u>

6  <u>directly negates the guilt</u> of a subject of the investigation, the prosecutor must
   present or otherwise disclose such evidence to the grand jury before seeking an

7  indictment against such a person. While a failure to follow the Department's policy
   should <u>not result in dismissal of an indictment</u>, <u>appellate courts</u> may refer

8  violations of the policy to the Office of Professional Responsibility for review.

9  (Emphasis added.)

10      In this case, there is no evidence that a ground may exist to dismiss the indictment because

11  of a matter that occurred before the grand jury.  As detailed in the statement of facts supra,

12  probable cause existed to believe that Defendant violated 8 U.S.C. § 1324.  The evidence clearly

13  indicates that Defendant violated 8 U.S.C. § 1324.

14      There has been a completely insufficient showing of a particularized need for the transcripts

15  of the grand jury proceedings to justify overcoming the necessary secrecy of the grand jury's

16  functions.  Defendant would not be able to obtain dismissal of the indictment based on conduct

17  before the grand jury. Therefore, Defendant's motion should be denied.

18      **B.**    **THE MOTION TO SUPPRESS STATEMENTS SHOULD BE  DENIED**

19      Defendant contends that the Court should suppress any statement made at the time

20  of his arrest on the grounds that Defendant's <u>Miranda</u> waiver was not knowing,

21  intelligent, and voluntary, that the statements made by Defendant were not voluntary, and

22  that Defendant's statements were a result of a two-step interrogation.  As discussed

23  below, these arguments lack merit.

24      **1.**    **Defendant Made A Knowing, Intelligent, and Voluntary Miranda
       Waiver**

25

26      In this case, <u>Miranda</u> warnings did precede custodial interrogation.   Accordingly,

27  agents did not violate <u>Miranda</u> by asking routine booking questions prior to providing

28  21

1    Defendant with his Miranda warnings.  A statement made in response to custodial

2    interrogation is admissible under Miranda v. Arizona, 384 U.S. 437 (1966), and 18

3    U.S.C. § 3501 if a preponderance of the evidence indicates that the statement was

4    made after an advisement of Miranda rights, and was not elicited by improper coercion.

5    See Colorado v. Connelly, 479 U.S. 157, 167-70 (1986) (preponderance of evidence

6    standard governs voluntariness and Miranda determinations; valid waiver of Miranda

7    rights should not be found in the "absence of police overreaching").

8        A valid Miranda waiver depends on the totality of the circumstances, including

9    the background, experience, and conduct of the defendant. North Carolina v. Butler, 441

10   U.S. 369, 374-75 (1979).   To be knowing and intelligent, "the waiver must have been

11   made with a full awareness of both the nature of the right being abandoned and the

12   consequences of the decision to abandon it." Moran v. Burbine, 475 U.S. 412, 421

13   (1986). The Government bears the burden of establishing the existence of  a valid

14   Miranda waiver.  Butler, 441 U.S. at 373.  In assessing the validity of a defendant's

15   Miranda waiver, this Courts should analyze the totality of the circumstances surrounding

16   the interrogations.  See Moran, 475 U.S. at 421.   Factors commonly considered include:

17   (1) the defendant's age (see Doe III, 155 F.3d at 1074-75 (valid waiver because the 17

18   year old defendant did not have trouble understanding questions, gave coherent answers,

19   and did not ask officers to notify parents)); (2) the defendant's familiarity with the

20   criminal justice system (see United States v. Williams, 291 F.3d 1180, 1190 (9th Cir.

21   2002) (waiver valid in part because defendant was familiar with the criminal justice

22   system from past encounters)); (3) the explicitness of the Miranda waiver (see United

23   States v. Bernard S., 795 F.2d 749, 753 n.4 (9th Cir. 1986) (a written Miranda waiver is

24   "strong evidence that the waiver is valid"), United States v. Amano, 229 F.3d 801, 805

25   (9th Cir. 2000) (waiver valid where Miranda rights were read to defendant twice and

26   defendant signed a written waiver)); and (4) the time lapse between the reading of the

27

28                                          22

1  Miranda warnings and the interrogation or confession (see Guam v. Dela Pena, 72 F.3d

2  767, 769-70 (9th Cir. 1995) (valid waiver despite 15-hour delay between Miranda

3  warnings and interview)). Furthermore, if there are multiple interrogations, as occurred in

4  this case, repeat Miranda warnings are generally not required unless an "appreciable

5  time" elapses between interrogations.  See United States v. Nordling, 804 F.2d 1466,

6  1471 (9th Cir. 1986).

7         Here, Border Patrol agents scrupulously honored the letter and spirit of Miranda in

8  carefully advising Defendant, of his Miranda rights prior to any post-arrest custodial

9  interrogation.  Defendant while being video taped, was advised of his Miranda rights,

10 both orally and in writing, before the interrogation.  Defendant orally agreed to waive his

11 Miranda rights and he signed a Miranda waiver form.  Defendant also initialed next to each

12 Miranda right on the advice of rights form.  Based on the totality of the circumstances, Defendant's

13 statements should not be suppressed because his Miranda waiver was knowing, intelligent, and

14 voluntary.

**2.     Defendant's Post-Arrest Statements Were Voluntary**

15        The inquiry into the voluntariness of statements is the same as the inquiry into the

16 voluntariness of a waiver of Miranda rights. See Derrick v. Peterson, 924 F.2d 813, 820 (9th

17 Cir.1990).   Courts look to the totality of the circumstances to determine whether the statements

18 were "the product of free and deliberate choice rather than coercion or improper inducement." Doe

19 III, 155 F.3d at 1074.

20        A statement is involuntary if "coerced either by physical intimidation or psychological

21 pressure."  United States v. Crawford, 372 F.3d 1048, 1060 (9th Cir. 2004) (quoting United States

22 v. Haswood, 350 F.3d 1024, 1027 (9th Cir. 2003)).  In determining whether a defendant's

23 confession was voluntary, "the question is 'whether the defendant's will was overborne at the time

24 he confessed.'" Clark v. Murphy, 331 F.3d 1062, 1072 (9th Cir.), cert. denied, 124 S. Ct. 446

25 (2003) (quoting Haynes v. Washington, 373 U.S. 503, 513 (1963)). Psychological coercion invokes

26 no per se rule. United States v. Miller, 984 F.2d 1028, 1030 (9th Cir. 1993). Therefore, the Court

27

28                                              23

1    must "consider the totality of the circumstances involved and their effect upon the will of the

2    defendant." Id. at 1031 (citing Schneckloth v. Bustamante, 412 U.S. 218, 226-27 (1973)); see also

3    United States v. Pinion, 800 F.2d 976, 980 (9th Cir. 1986) (the test is whether, considering the

4    totality of the circumstances, the government obtained the statement by physical or psychological

5    coercion or by improper conduct). The Constitution does not bar the use by interrogating

6    officers of any statement that could be construed as a threat or promise, however slight, but only

7    those which constitute outrageous behavior under the circumstances and which in fact induce a

8    confession. See United States v. Guerrero, 847 F.2d 1363, 1366 (9th Cir. 1988).

9         In determining the issue of voluntariness, this Court should consider the five factors under

10   18 U.S.C. § 3501(b). United States v. Andaverde, 64 F.3d 1305, 1311 (9th Cir. 1995). These five

11   factors include: (1) the time elapsing between arrest and arraignment of the defendant making the

12   confession, if it was made after arrest and before arraignment, (2) whether such defendant knew

13   the nature of the offense with which he or she was charged or of which he was suspected at the

14   time of making the confession, (3) whether or not such defendant was advised or knew that he or

15   she was not required to make any statement and that any such statement could be used against him,

16   (4) whether or not such defendant had been advised prior to questioning of his or her right to the

17   assistance of counsel; and (5) whether or not such defendant was without the assistance of counsel

18   when questioned and when giving such confession. 18 U.S.C. § 3501(b). All five statutory factors

19   under 18 U.S.C. § 3501(b) need not be met to find the statements were voluntarily made. See

20   Andaverde, 64 F.3d at 1313.

21        As discussed above, Defendant was read his Miranda rights and was provided with a

22   written advice of rights and Miranda waiver form prior to her post-arrest interview. Defendant

23   explicitly stated that he understood his Miranda rights and agreed to waive those rights. See

24   United States v. Gamez, 301 F.3d 1138, 1144 (9th Cir. 2002). Defendant's statements were not

25   the product of physical intimidation or psychological pressure of any kind by any government

26   agent.

27

28                                    24

1    Defendant's demeanor and that of the agents on the video taped statement makes it clear

2    that no intimidation had occurred.  Additionally, Agents statements that they are not the ones that

3    determine what charges will be filed, is not an implied promise making Defendant's statements

4    involuntary.

5    Finally, Agents are in no way Defendant's superior officers nor did they hold themselves

6    out to be. The setting in which Defendant was questioned was that of a standard office with a

7    padded seat.  Defendant was placed in an ankle cuff attached to a floor I-beam to ensure officer

8    safely.  There was nothing coercive about the environment or way in which agents questioned

9    Defendant.   There is no evidence that Defendant's will was overborne at the time he made his

10   post-arrest statements.  Consequently, Defendant's motion to suppress his statements as

11   involuntarily should be denied.

12       **2.    Border Patrol Agents Did Not Conduct a Deliberate Two-Step Interrogation**

13   Relying on the Supreme Court's decision in <u>Missouri v.Seibert</u>, 124 S.Ct. 2601 (2004),

14   Defendant next contends his statements taken at the Border Patrol station following <u>Miranda</u>

15   warnings should be suppressed in light of the fact that his post-administrative rights statement was

16   elicited  without <u>Miranda</u> warnings.  However, Defendant's post-<u>Miranda</u> statement obtained by

17   Border Patrol agents was not taken in violation of <u>Seibert</u> or the other controlling Supreme Court

18   case, <u>Oregon v. Elstad</u>, 470 U.S. 298 (1985).

19   This case does not reflect the type of situation faced by the Supreme Court in <u>Seibert</u>.  In

20   <u>Seibert</u>, the Supreme Court suppressed post-<u>Miranda</u> statements where "officers interrogated

21   Seibert at length before giving the <u>Miranda</u> warning and gave her only a short break without any

22   change of location after she confessed, and then the same officer from the prewarning interrogation

23   expressly used her unwarned statements to obtain a warned confession."   <u>United States v.</u>

24   <u>Williams</u>, 435 F.3d 1148, 1155 (9th Cir. 2006).  The egregious nature of the questioning in <u>Seibert</u>

25   is in sharp contrast with the questioning that took place in this case.  In fact, this case more closely

26   resembles the situation in <u>Elstad</u>.  In <u>Elstad</u>, "a burglary suspect . . . made incriminating comments

27

28                                                          25

1    to a police officer at his home without first receiving a Miranda warning.  Officers then took him

2    to the county sheriff's office, placed him in an interrogation room, read him his Miranda rights and

3    questioned him at length." Id. at 1151.  Elstad subsequently "expanded significantly on his earlier

4    statements and made a full confession" – this confession occurred 30 minutes after the initial

5    inculpatory comments made by Elstad.  Id.  The Supreme Court did not suppress the subsequent

6    confession, and held that a "suspect who has once responded to unwarned yet uncoercive

7    questioning is not thereby disabled from waiving his rights and confessing after he has been given

8    the requisite Miranda warnings." Elstad, 470 U.S. at 318.  The same should hold true in this case.

9         In interpreting the interaction between Seibert and Elstad, the Ninth Circuit, relying on the

10   numerous opinions in Seibert, held "that where law enforcement officers deliberately employ a

11   two-step interrogation to obtain a confession and where separations of time and circumstance and

12   additional curative warnings are absent or fail to apprise a reasonable person in the suspect's shoes

13   of his rights, the trial court should suppress the confession." Williams, 435 F.3d at 1158.

14   However, "[i]n situations where the two-step strategy was not deliberately employed, Elstad

15   continues to govern the admissibility of postwarning statements." Id.

16        In applying Seibert, the initial inquiry is whether "law enforcement officers deliberately

17   employ[ed] a two-step interrogation to obtain a confession . . . ." Williams, 435 F.3d at 1158.  The

18   Ninth Circuit held that "in determining whether the interrogator deliberately withheld the Miranda

19   warnings, courts should consider whether objective evidence and any available subjective

20   evidence, such as an officer's testimony, support an inference that the two-step interrogation

21   procedure was used to undermine the Miranda warning." Id. at 1158-59.  The Ninth Circuit further

22   noted that "objective evidence would include the timing, setting and completeness of the

23   prewarning interrogation, the continuity of police personnel, and the overlapping of the pre- and

24   postwarning statements." Id. at 1159.

25        In a recent case, the Ninth Circuit upheld a district court's denial of a defendant's motion

26   to suppress based on a similar argument raised by Defendant.  In United States v. Narvaez-Gomez,

27

28                                            26

489 F.3d 970 (9th Cir. 2007), the Border Patrol agent who transported the defendant to the station asked the defendant whether he had ever been arrested by Border Patrol and whether he had ever been deported. Id. at 973. Later, another Border Patrol agent advised Defendant of his Miranda rights, which he acknowledged and waived. Id. The Narvaez-Gomez Court looked to the brief, informal setting of the pre-Miranda interrogation, the second agent's sole involvement in the post-warning interrogation and the lack of reference to the prewarning statements during the more comprehensive post-warning interrogation. Id. at 974. The Ninth Circuit also noted that the change in setting and time span of approximately four hours between statements indicate a lack of deliberateness. Id.

The facts of this case simply do not support the conclusion that a two-step interrogation occurred. Agents did not interrogate Defendant prior to being Mirandized. There was no second interrogation. Defendant made a spontaneous statement while he was being arrested stating "Oh, I know what this is about, I know now." This statement was made while agents were walking Defendant to a private location to be questioned, without having been asked any questions. Prior to Defendant making any further statements, he was properly Mirandized and only questioned once. Consequently, Defendant's motion to suppress his statements as involuntarily should be denied.

### 3. The Motion Should Be Denied Without An Evidentiary Hearing

First, the Court can and should deny Defendant's Motion without a suppression hearing. Under Ninth Circuit and Southern District precedent, as well as Southern District Local Criminal Rule 47.1(g)(1)-(4), a defendant is entitled to an evidentiary hearing on a motion to suppress only when the defendant adduces specific facts sufficient to require the granting of the defendant's motion. United States v. Batiste, 868 F.2d 1089, 1093 (9th Cir. 1989) ("[T]he defendant, in his motion to suppress, failed to dispute any material fact in the government's proffer. In these circumstances, the district court was not required to hold an evidentiary hearing.").

27

Defendant's motion failed to specifically identify the statements that he seeks to suppress or allege any specific factual or legal dispute regarding the inadmissibility of the statements. Defendant does not allege that the government agents failed to advise him of his <u>Miranda</u> rights, that the <u>Miranda</u> rights provided were somehow defective. Defendant merely asserts that his statements were the product or coercion by Government agents.

Defendant has failed to demonstrate the causal connection between the alleged improper conduct by the agents and the statements made by Defendant. The reason Defendant has not established a causal connection is because there was no improper conduct by the agents. In essence, Defendant's motion to suppress lacks sufficient definiteness, clarity, and specificity to enable the United States to prepare for any motion to suppress statements or the Court to make a reasoned finding of any impropriety.

**C.      THE COURT SHOULD DENY MOTION TO SUPPRESS CELL PHONES**

Defendant moves to suppress evidence seized from a search of his cellular phones that occurred incident to his arrest. The Fourth Amendment protects individuals against unreasonable searches and seizures. U.S. Const. Amend. IV. "A search incident to arrest" is an exception to the general rule against warrantless searches. <u>See</u> <u>United States v. Hudson</u>, 100 F.3d 1409, 1419 (9th Cir. 1996). "A search incident to arrest must be conducted at about the same time as the arrest." <u>Id.</u> The cellular telephone has been considered part of the person that can be searched incident to arrest. <u>See</u> <u>United States v. Finley</u>, 477 F.3d 250, 260 (5th Cir. 2007) (holding that police officer's search of cell phone even after moving defendant from scene of arrest to his residence was "still substantially contemporaneous with his arrest" and, therefore, permissible); <u>see</u> <u>also</u> <u>United States v. Chadwick</u>, 433 U.S. 1 (1977) (holding that police may search a container within a vehicle without a warrant if they have probable cause to believe the container itself holds contraband or evidence). Recently, the Ninth Circuit held that reasonable suspicion was not needed for customs officials to search a laptop computer or other personal electronic storage devices at the border. <u>United States v. Arnold</u>, – F.3d –, 2008 WL 1776525 (9th Cir., Apr. 21, 2008); <u>see</u> <u>also</u> <u>United</u>

1    States v. Cortez-Rocha, 394 F.3d 1115, 1122 (9th Cir. 2005) (refusing to fashion a "least restrictive

2    means test").

3          Defendant's motion to suppress evidence should be denied without an evidentiary hearing

4    because he failed to allege a specific factual dispute and failed to support his contentions with a

5    sworn declaration as required by Crim LR 47.1(g).  Even if Defendant could articulate a specific

6    factual dispute, the search of a cell phone, which is a "personal electronic storage device", incident

7    to arrest, complied with the Fourth Amendment.

8          Additionally, Defendant voluntarily gave agents consent to search his phone at the time of

9    his arrest further establishing compliance with the Fourth Amendment.

10         **D.      DEFENDANT' S MOTION TO SEVER SHOULD BE DENIED**

11    _____Defendant's motion for severance are based on separate grounds: (1) that he will be denied

12    access to exculpatory evidence of the co-defendant;  (2) that there may be problems under

13    Bruton v. United States, 391 U.S. 123 (1968); (3) he may present antagonistic defenses; and (4)

14    that he may be found guilty by association.  Defendant has failed to attach any affidavits to support

15    his claims.

16         **1.      General Principles**

17         Federal Rule of Criminal Procedure 8(b) specifically provides for the joinder of defendants

18    where they participated in the same series of acts or transactions constituting an offense or group

19    of offenses.

20         Two or more defendants may be charged in the same indictment or information if
             they are alleged to have participated in the same act or transaction or in the same
21           series of acts or transactions constituting an offense of offenses.  Such defendants
             may be charged in one or more counts together or separately and all of the
22           defendants need not be charged in each count.

23    The granting or denial of a motion for severance is governed by Federal Rule of Criminal

24    Procedure 14.  Rule 14 provides in pertinent part:

25         If it appears that a defendant or the Government is prejudiced by a joinder of offenses or
             of defendants in an indictment or information or by such joinder for trial together, the court
26           many order an election or separate trials of counts grant a severance of defendants or
             provide whatever other relief justice requires.

27

28                                          29

1 In other words, although joinder is generally favorable because it promotes efficiency, <u>see United</u>

2 <u>States v. Tootick</u>, 952 F.2d 1078, 1080 (9th Cir. 1991), Rule 14 provides that the trials may be

3 severed when it is apparent that a joint trial would cause prejudice.  The Supreme Court has held

4 that "when defendants have been properly joined under Rule 8(b), a district court should grant

5 severance under Rule 14 only if there is a serious risk that a joint trial would prejudice a specific

6 trial right of one of the defendants or prevent the jury from making a reliable judgment about guilt

7 or innocence." <u>Zafiro v. United States</u>, 506 U.S. 534, 536 (1993).

8    **2.**  **The Government Will Abide by the Rule of <u>Crawford v. Washington</u>.**

9    Defendants' lengthy discussion of the Confrontation Clause is speculative and plainly

10 insufficient to establish prejudice under Rule 14.  The Government is cognizant of defendants'

11 Sixth Amendment rights and will abide by the rule of <u>Crawford v. Washington</u>, 541 U.S. 36

12 (2004), with respect to any evidence of testimonial statements.

13    3.  **<u>Bruton Does Not Mandate Severance</u>**

14    Relying on <u>Bruton v. United States</u>, 391 U.S. 123 (1968), Defendant argues that the

15 codefendants' statements may warrant a severed trial.  In <u>Bruton</u>, the Supreme Court held that the

16 Sixth Amendment right to confront adverse witnesses if the non-testifying codefendant makes an

17 confession that implicates the defendant and the Government introduces the confession into

18 evidence at their joint trial, even if the jury is instructed to consider the confession only against the

19 codefendant.  <u>Id</u>. 391 U.S. at 135-136.

20    If necessary, the Government will sufficiently redact the codefendant's statement in

21 accordance with <u>Gray v. Maryland</u>, 523 U.S. 185, 186 (1998)(Bruton rule prohibiting introduction

22 of joint trial of confession of nontestifying codefendant which names defendant as the perpetrator

23 extends also to redacted confessions in which name of the defendant is replaced with obvious

24 indication of deletion, such as blank space, word "deleted" or similar symbol).  In <u>Gray v.</u>

25 <u>Maryland</u>, 523 U.S. 185 (1998), the Supreme Court revisited the issue of redacted codefendant

26 statements in joint trials.  In <u>Gray</u>, the confession had been redacted to remove the defendant's

27

28            30

name, but his name was replaced with a blank space in the written confession and the worked "deleted" in the oral testimony. Thus, unlike <u>Richardson</u>, which removed not only defendant's name but any reference to his existence, the confession in Gray referred directly to the existence of the non-confessing defendant. Id. at 185. The Court held that "redactions that simply replace a name with an obvious blank space or a word such as 'deleted' or a symbol or other similarly obvious indication of alteration....leave statements that considered as a class, so closely resemble Bruton's unredacted statements that,...the law must require the same result.

Where a defendant's name is replaced with the phrase "another person," "another individual", "someone", and "pronouns" may avoid Bruton issues, provided that the incrimination of the defendant is only by reference to evidence other than the redacted statement and a limiting instruction is given to the jury. See <u>United States v. Verduzco-Martinez</u>, 186 F.3d 1208 (10th Cir. 1999)(use of "another person" did not violate defendant's Sixth Amendment right to confront and cross-examine witnesses, as statements doe not identity defendant or direct jury's attention to him, and redaction did not obviously indicate to jury that statements had been altered); United Sates v. Akinkoye, 174 F.3d 451 (4th Cir. 1999)(use of neutral phrases "another person" and "another individual" did not facially implicate defendant and did not violate Bruton).

### 4.    **Antagonistic Defenses**

Defendants argue for severance because of possible antagonism between defenses. The motion should be denied.

To warrant severance on the basis of antagonistic defenses, codefendants must show that their defenses are irreconcilable and mutually exclusive. See <u>United States v. Angwin</u>, 271 F.3d 786 (9th Cir. 2001)(rejection of defense argument that ignorance is irreconcilable with a defense based on a lack of guilty intent such as duress); <u>United States v. Sherlock</u>, 962 F.2d 1349 (9th Cir. 1992). Defenses are mutually exclusive when "acquittal of one codefendant would necessarily call for the conviction of the other." <u>United States v. Tootick</u>, 952 F.2d 1078, 1081 (9th Cir. 1991); <u>United States v. Throckmorton</u>, 87 F.3d 1069 1069, 1072 (9th Cir. 1996)(noting that "a defendant

1    must show that the core of the codefendant's defense is so irreconcilable with the core of his own

2    defense that the acceptance of the codefendant's theory by the jury precludes acquittal of the

3    defendant")..  In <u>Throckmorton</u>, one defendant defended on the theory of insufficient evidence,

4    while the other claimed to be acting as a DEA informant and the Ninth Circuit found that "these

5    defenses are not, at their core, irreconcilable." <u>See also</u> <u>United States v. Ramirez</u>, 710 F.2d 535,

6    546 (9th Cir. 1983); <u>United States v. Brady</u>, 579 F.2d 1121, 1129 (9th Cir. 1978), <u>cert. denied</u>, 439

7    U.S. 1074 (1979); <u>United States v. Marble</u>, 574 F.2d 224, 231 (5th Cir. 1978).  The lesson of all

8    these cases is that the court should not grant a severance "absent clear evidence" that the defenses

9    are truly mutually exclusive.

10           Even when defendants present antagonistic defenses, such defenses "are not prejudicial per

11   se". <u>Zafrino v. United States</u>, 506 U.S. 534 (1993)(noting that a district court should grant a

12   severance under Rule 14 only if there is a serious risk that a joint trial would compromise a specific

13   right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or

14   innocence).   Here, defendants have failed to show that their defenses are "truly mutually

15   exclusive."

16           **5.       <u>Severance Due To "Guilt By Association"</u>**

17           Defendants suggest that there is a substantial risk that they will not receive a fair trial unless

18   severance is granted.

19           The anticipation of a "spill-over effect," that is, that a jury may fail to compartmentalize

20   the evidence as it relates to one defendant versus another, does not compel a severance.  <u>United</u>

21   <u>States v. McDonald</u>, 576 F.2d 1350.  "The mere fact that there may be more incriminating evidence

22   against one codefendant than another does not provide a sufficient justification for separate trials."

23   <u>United States v. Polizzi</u>, 801 F.2d 1543, 1554 (9th Cir. 1986).    <u>See also</u> <u>United States v.</u>

24   <u>Hernandez</u>, 952 F.2d 1110 (9th Cir. 1991)(Court rejected defendant's argument that the jury must

25   have had difficulty separating the evidence against co-defendant because of his "familial

26   association").

27

28                                                      32

1    Furthermore, a defendant seeking severance based on the "spillover" effect of evidence

2    admitted against a co-defendant must also demonstrate the insufficiency of limiting instruction

3    given by the judge.  See Zafiro v. United States, 506 U.S. 534 (1993)(the risk of prejudice posed

4    by joint trials can be cured by proper jury instructions); United States v. Nelson, 137 F.3d 1094

5    (9th Cir. 1998)(no severance necessary in robbery case where judge gave limiting instructions);

6    United States v. Joetzki, 952 F.2d 1090 (9th Cir. 1991), citing, United States v. Candoli, 870 F.2d

7    496, 510 (5th Cir. 1989).

8    Here, Defendant speculates that the jury would not be able to understand his role in the

9    crime and that he would be found guilty by mere association.  This is not the situation where

10    Defendant will be found guilty by association, especially in view of the evidence in this case.

11    Defendant's attempt to minimize his role in the crime to support a justification for a severance

12    based on "mere association" with codefendants clouds the narrow issue -- the issue being whether

13    the jury will be able to compartmentalize the evidence as it relates to Defendant.  The jury will

14    should have no problems with compartmentalizing the evidence against Defendant.

15    In that Defendant has failed to carry his burden under these standards, defendant's motion

16    should be denied.  If the Court deems it necessary to consider severing the trial, the Government

17    would request a further hearing on this matter.

18    **D.    NO OPPOSITION TO LEAVE TO FILE FURTHER MOTIONS**

19    The United States does not object to the granting of leave to allow Defendant to file further

20    motions, as long as the order applies equally to both parties and additional motions are based on

21    newly discovered evidence or discovery provided by the United States subsequent to the instant

22    motion at issue.

23    //

24    //

25    //

26    //

27

28                                            33

1

IV

2

**CONCLUSION**

3        For the foregoing reasons, the government respectfully requests that Defendant's motions,

4   except where not opposed, be denied.

5        DATED: September 9, 2008.

6                                        Respectfully submitted,

7                                        KAREN P. HEWITT
                                         United States Attorney

8

9                                        s/ W. Mark Conover
                                         W. MARK CONOVER
10                                       Assistant United States Attorney

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

UNITED STATES DISTRICT COURT

2

SOUTHERN DISTRICT OF CALIFORNIA

3

UNITED STATES OF AMERICA,                    Case No. 08CR1916-JM

4

             Plaintiff                    CERTIFICATE OF SERVICE

5

      v.

6

MANLEY SMITH (2),

7

            Defendant(s).

8

9

IT IS HEREBY CERTIFIED THAT:

10

       I, W. MARK CONOVER, am a citizen of the United States and am at least eighteen years

11

of age. My business address is 880 Front Street, Room 6293, San Diego, California 92101-8893.

12

       I am not a party to the above-entitled action. I have caused service of UNITED STATES'
RESPONSE TO DEFENDANT'S MOTIONS on the following parties by electronically filing the

13

foregoing with the Clerk of the District Court using its ECF System, which electronically notifies
them.

14

      1. Jason Serr, Esq.

15

I declare under penalty of perjury that the foregoing is true and correct.

16

Executed on September 9, 2008.

17

18

                       s/ W. Mark Conover
                       W. MARK CONOVER

19

20

21

22

23

24

25

26

27

28